# In the United States Court of Federal Claims

**No. 09-380L**

**(Filed February 18, 2011)**

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | |
|---|---|
| **JERRY McGUIRE,** | \* |
| | \* Fifth Amendment Taking; |
| **Plaintiff,** | \* Motion to Dismiss, RCFC |
| | \* 12(b)(1) and 12(b)(6); |
| **v.** | \* Subject Matter Jurisdiction; |
| | \* Law of the Case; Ripeness; |
| **UNITED STATES OF AMERICA** | \* Motion for Summary Judgment, |
| | \* RCFC 56(c). |
| **Defendant.** | \* |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

*David A. Domina*, Law Office of Domina Law Group, Omaha, NE, attorney of record for plaintiff.

*Jessica M. Held*, U.S. Department of Justice, Environmental and Natural Resources Division, with whom was *Assistant Attorney General Ignacia S. Moreno*, for defendant.

## OPINION AND ORDER

*Futey,* **Judge**.

Jerry McGuire brought this inverse condemnation claim nine years ago in a federal bankruptcy proceeding in district court in Arizona. He alleges that the government took his leased property by removing a bridge he used to access the northern portion of the property. He thus demands more than $2 million in compensation. After a trial and appeal, the United States Court of Appeals for the Ninth Circuit held that exclusive jurisdiction over the merits of McGuire's claim rests in the United States Court of Federal Claims. *McGuire v. United States*, 550 F.3d 903, 906 (9th Cir. 2008). The Ninth Circuit therefore remanded the case with instructions to transfer it here, and this Court received it on June 10, 2009.

On September 3, 2010, defendant moved to dismiss under Rules 12(b)(1) and 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC"). Defendant argues that jurisdiction is lacking because the claim never ripened, even though the Ninth Circuit found it ripe. In the alternative, defendant moves

for summary judgment under RCFC 56(c) and asserts that McGuire has failed to show a legally cognizable property interest, that McGuire cannot show a compensable taking, and that the government's use of its public safety power prevents a taking from being found.

Before proceeding further, the Court must briefly discuss a jurisdictional issue.  The bankruptcy court exercised jurisdiction over McGuire's takings claims based on the decision of the United States Court of Appeals for the Federal Circuit in *Quality Tooling v. United States*.  47 F.3d 1569 (Fed. Cir. 1995).  There, a divided panel held that "[t]he Tucker Act waives the government's immunity from suit on its contracts in any court to which Congress grants jurisdiction to hear the claim."  *Quality Tooling*, 47 F.3d at 1575.  A district court sitting in bankruptcy thus can exercise jurisdiction over government contracts claims, since 28 U.S.C. § 1334(b) (2006) gives it jurisdiction over "all civil proceedings" arising under or related to the bankruptcy.  *Quality Tooling*, 47 F.3d at 1573.  The Ninth Circuit on appeal, however, explicitly disagreed with the Federal Circuit's holding in *Quality Tooling*, found that the Tucker Act's waiver of sovereign immunity applies only to this court, and remanded the case for transfer here under 28 U.S.C. § 1631 (2006).  *McGuire*, 550 F.3d at 914.  Under Federal Circuit precedent, a transfer under § 1631 is improper if the transferor court has jurisdiction, and, under *Quality Tooling*, the transferor court may have had jurisdiction.  *Fisherman's Harvest, Inc. v. PBS & J*, 490 F.3d 1371, 1375 (Fed. Cir. 2007).

The Court considers it proper to proceed with the resolution of McGuire's claims for three primary reasons.  First, in *Quality Tooling*, the majority itself described the decision as fairly narrow, in response to the fear of the dissent that the decision would effect a "wholesale transfer" of takings cases "from the Court of Federal Claims to the district courts."  *Quality Tooling*, 47 F.3d at 1578.  Second, although the majority's reasoning would likely encompass takings claims, the specific holding is limited to the jurisdiction of a district court sitting in bankruptcy to hear government *contracts* claims, not takings claims.  *Id.* at 1575.  Third, if this Court were to refuse to hear McGuire's takings claims due to an improper transfer under § 1631, and transfer this case back to the district court, then the Court fears that "jurisdictional ping-pong" would result.  *Christianson v. Colt Indus. Op. Corp.*, 486 U.S. 800, 818 (1988).

I.   **Background**

     A.  The Lease and Removal of the Eighth Avenue Bridge

McGuire entered into a ten-year lease on January 1, 1995 with the Colorado River Indian Tribes ("CRIT").  The lease covered approximately 1,355 acres on the CRIT reservation in Arizona, and McGuire planned to farm alfalfa on the land.  Rent was set at $226,411.92 annually for the first five years and, for the next five years, at the appraised value.  The Bureau of Indian Affairs ("BIA") approved the lease on June 13, 1996, as was required since the United States

holds the land in trust for the CRIT.  At the outset of the lease, McGuire claims that he invested approximately $1.2 million in the leased property and tools to farm it, although no evidence apart from his trial testimony has been offered to the Court.[1]

Under the lease, the property is "subject to any prior, valid, existing claim or rights-of-way, including the present existing roads."[2]   Additionally, the leased property itself is bisected into northern and southern portions by Mohave Road, and a BIA-owned irrigation canal runs parallel to this road.  The BIA has a right-of-way on both sides of the canal.  The canal and right-of-way were both present when McGuire entered into the lease.

At the time the lease was signed, a wooden bridge crossed the BIA canal at the intersection of Eighth Avenue and Mohave Road.  In place since at least 1969 and constructed by a prior tenant, the bridge allowed convenient access to both sides of the property, and many people, including government officials, used the bridge.  The lease, however, does not explicitly mention the bridge.  The lease does authorize "ingress and egress to the leased premises over existing roadways under the possession and control" of the CRIT.[3]

At some point in 1998, Allen Anspach, Superintendent of the Colorado River Agency ("CRA") of the BIA, grew concerned about the structural integrity of the bridge.  Anspach shared these concerns with McGuire in the summer of 1998 and told him that the BIA was going to remove the bridge.  On February 5, 1999, Anspach informed McGuire by letter of BIA's plan to remove "the unsafe and unauthorized wooden bridge" in January 2000.[4]  Anspach also wrote, "If you should decide that you need to bridge the canal in order to operate your farm you may submit to the Agency Superintendent plans, with specifications, for a new bridge and apply for a crossing permit."[5]   On August 25, 1999, Anspach again wrote McGuire to confirm that the BIA would remove the bridge in January 2000 and stated, "[S]hould you feel a new bridge is needed at this location it will be necessary for you to submit the required documentation to the Agency Superintendent in accordance with the enclosed requirements from 25 CFR, Chapter 171.9."[6]

In the February and August letters, Anspach told McGuire that if he had any questions, he could contact two local officials: Ted Henry, Irrigation System Manager, or Jeffrey Hinkins, Supervisory General Engineer.  According to

---

[1] A trial was previously held in federal bankruptcy court.  As part of their submissions regarding defendant's dispositive motion, the parties have submitted excerpts of that trial testimony.

[2] Def.'s Mot. Dismiss Or Mot. Summ. J. & Mem. Supp. Ex. 1, at 3 [hereinafter Def.'s Mot.].

[3] *Id.* at 10.

[4] Def.'s Mot. Ex. 5.

[5] *Id.*

[6] Def.'s Mot. Ex. 7.

McGuire's trial testimony, he contacted Hinkins and Henry "[m]any times" about what he had to do to put in a new bridge.[7]  McGuire claims he discussed the specifics of a bridge and sketched out a plan with these officials, and they informed him that the approval decision for a new bridge ultimately rested with Anspach.   Hinkins, however, testified that Henry and he only discussed a replacement bridge with McGuire and never received "any written submission" or "documentation" with respect to a bridge design, nor did they tell him to talk to Anspach.[8]

McGuire filed suit against the BIA in tribal court in October 1999 in an attempt to block the removal of the bridge.  He alleged in the complaint that it would be illegal and a breach of contract to remove the bridge, as well as a taking.  The BIA did not appear in court, and no record of any judgment from that proceeding has been submitted to the Court.

On November 12, 1999, Anspach wrote McGuire to inform him that the bridge would be closed immediately and then removed, as planned, in January 2000.  Anspach also wrote, "We again encourage you to apply for a permit to replace the current structure with one that meets [BIA's] design and safety requirements. (25 CFR 171.9)."[9]  According to the letter, the BIA had decided to remove the bridge "to limit the liability of the United States and to protect the public" and the decision to remove the bridge was "final for the Department of Interior."[10]  If McGuire was unsatisfied with the decision to remove the bridge, the letter informed him that he could "file in U.S. District Court."[11]  McGuire never filed such a challenge in district court.[12]

The bridge was removed in January 2000.  McGuire withheld his January 1, 2000 rental payment because he considered the lease breached.  At trial, McGuire testified that he could have made this payment, but he chose not to do so.  On July 11, 2000, the CRIT informed McGuire that failure to pay rent was a breach of the lease, and the lease was cancelled in August 2000.  McGuire appealed this decision to the BIA's Western Regional Director, who affirmed the lease cancellation on February 2, 2001.  McGuire did not appeal that director's decision to the Interior Board of Indian Appeals.

B.  Alfalfa Farming and Alternate Means of Access

McGuire used his farm to plant alfalfa and then harvest it as hay.  Alfalfa grows on a five-year cycle and must be frequently harvested; McGuire contends that removal of the bridge made it too difficult for his haulers to remove the harvested alfalfa hay.  At trial, McGuire described the farming process and the

---

[7] Resp. Summ. J. Mot. Ex. 1, at 255 [hereinafter Pl.'s Resp.].
[8] Pl.'s Resp. Ex. 1, at 358.
[9] Def.'s Mot. Ex. 8.
[10] *Id.*
[11] *Id.*
[12] Pl.'s Resp. Ex. 1, at 170–71.

equipment required.  When the alfalfa is ready for harvest, a machine called a swather or wind rower cuts the hay.  The cut swaths of hay are left in the field for a number of days, and then a tractor pulls a set of rakes through the hay to divide it into rows.  A hay baler drives through the rows, picks up the hay, and compresses it into bales.  McGuire's bales ranged from 80 to 135 pounds.  After the hay is baled, a machine called a roadsider picks up the bales and arranges them into large stacks suitable for review by potential purchasers and eventual pickup by a hauler.  Finally, a hauler transports bales of purchased hay off of the farm.  Defendant's expert provided the Court with general dimensions of the trucking rigs used by haulers for these hay bales.[13]

In 1999 and 2000, McGuire stacked his baled hay near the Eighth Avenue Bridge, and, before the bridge's removal, his haulers crossed that bridge to pick up the hay from that stack.  After the removal of the bridge, McGuire had to use small gooseneck trailers to remove the hay, and many of his haulers refused to repeat the process, which they found dangerous.  McGuire contends that removal of the bridge made it inefficient to haul hay off of the northern portion of his property.

Defendant asserts that McGuire had other options for removing the hay.  Defendant's expert, Dr. L. Niel Allen, identified four options for removing hay from the property.[14]  First, McGuire could have accessed the stack at Eighth Avenue from a bridge to the west at Tenth Avenue, but he would have had to make approximately $25,960 in capital costs to improve this route, as well as incur $9,600 annually in hauling costs due to the lengthened drive time.  Second, McGuire could have accessed the Eighth Avenue stack from the east via a bridge at Brown Road, which would require $8,600 in capital costs and $14,400 annually in additional hauling costs.  Third, McGuire could have used a more distant northern route via Levee Road, which would have cost him an additional $9,600 per year in hauling costs, as well as $500 to clear brush.  Fourth, Dr. Allen suggested that McGuire could have moved the location of his stacks nearer to either the Tenth Avenue Bridge or the Brown Road Bridge, which would have cost him approximately $30,266 over the remainder of the lease.

All told, Dr. Allen estimated the cost of these four options to range from $30,266 to $78,600 over the remainder of the lease.  In his response, McGuire does not present any evidence or testimony to controvert Dr. Allen's findings and estimates; he only states at one point that Dr. Allen's findings are "not possible."[15]  McGuire instead insists that "[t]he bridge provided the only access point for the farm's northern section."[16]

---

[13] *See* Def.'s Mot. Ex. 15.

[14] *Id.*

[15] Resp. Def.'s Proposed Findings of Fact ¶ 13.

[16] *Id.* at ¶ 13.1.

C. Procedural History

In June 2001, McGuire filed for Chapter 11 bankruptcy relief in the United States District Court of Arizona. He then filed, on November 13, 2001, an inverse condemnation claim against the United States. *McGuire*, 550 F.3d at 908. Defendant moved to dismiss for lack of subject matter jurisdiction on sovereign immunity grounds. *Id.* As noted above, the bankruptcy court relied on *Quality Tooling*, and issued a recommendation that sovereign immunity had been waived by the Tucker Act, 28 U.S.C. § 1491 (2006). *McGuire*, 550 F.3d at 908. The district court adopted these recommendations and remanded for trial. *McGuire*, 550 F.3d at 908. After trial, the bankruptcy court concluded that the United States had committed a regulatory taking and recommended an award of $1,132,059.60. *Id.* This amount represented the rent McGuire would have paid over the next five years of the lease. The district court rejected this recommendation and found that McGuire's claim was not ripe for review because he had not followed the proper procedures for seeking a replacement bridge. *Id.*

On appeal, the Ninth Circuit reversed and found the claim ripe for review. *Id.* at 910. The court also, however, found the decision of the Federal Circuit in *Quality Tooling* to be erroneous and held that the district court lacked jurisdiction over the merits of the takings claim, since it exceeds $10,000. *Id.* at 913. The court therefore remanded the case to the district court, with instructions to transfer it here pursuant to 28 U.S.C. § 1631. *Id.* at 915.

Following transfer, a complaint was filed in this Court on June 30, 2009. The parties conducted limited discovery, and on September 3, 2010 defendant moved to dismiss or, in the alternative, for summary judgment. McGuire filed a response on September 21, 2010, and defendant filed a reply on September 28, 2010. Oral argument was held on January 19, 2011.

II. **Analysis**

Defendant raises two primary issues in its motion. Defendant first argues that the takings claim never ripened, and thus moves to dismiss. In the alternative, defendant argues that even if the claim is ripe, McGuire cannot demonstrate a taking, and that summary judgment in defendant's favor is therefore appropriate.

A. Motion to Dismiss

The issue of ripeness, around which defendant centers its motion to dismiss, was previously briefed before and adjudicated by the Ninth Circuit. That court found the claim ripe. *McGuire*, 550 F.3d at 910. According to defendant, however, the Ninth Circuit's discussion of ripeness was mere dicta, issued by a court without jurisdiction, and this Court must reexamine the issue. McGuire, on the other hand, argues that the Court is bound by the Ninth Circuit's determination under the law of the case doctrine. The Court disagrees with elements of both parties' arguments but will abide by the Ninth Circuit decision.

1.  *Standard of Review*

Defendant has moved to dismiss for lack of jurisdiction under RCFC 12(b)(1).  The Tucker Act sets the "jurisdictional reach" of the Court of Federal Claims.  **Rick's Mushroom Serv., Inc. v. United States**, 521 F.3d 1338, 1343 (Fed. Cir. 2008).  That Act waives the sovereign immunity of the federal government for certain claims, including those founded upon the Constitution.  28 U.S.C. § 1491(a)(1); s*ee also* **Sanders v. United States**, 252 F.3d 1329, 1334 (Fed. Cir. 2001).  Since the Tucker Act does not itself create any substantive rights, a plaintiff must identify a substantive right, such as the Takings Clause of the Fifth Amendment, that entitles it to relief.  *See* **United States v. Testan**, 424 U.S. 392, 398 (1976); **Jan's Helicopter Serv., Inc. v. F.A.A.**, 525 F.3d 1299, 1309 (Fed. Cir. 2008).  Although the Court of Federal Claims shares jurisdiction with federal district courts for takings claims not in excess of $10,000, 28 U.S.C. § 1346(a)(2), the court has exclusive jurisdiction for claims over $10,000.  *See* **E. Enters. v. Apfel**, 524 U.S. 498, 520 (1998); **Jan's Helicopter**, 525 F.3d at 1304.

A plaintiff must establish by a preponderance of the evidence facts sufficient to invoke the court's jurisdiction.  *See* **M. Maropakis Carpentry, Inc. v. United States**, 609 F.3d 1323, 1327 (Fed. Cir. 2010).  At the jurisdictional stage, a plaintiff does not have to prove these facts but "need only plead[]" sufficient facts.  **Total Med. Mgmt., Inc. v. United States**, 104 F.3d 1314, 1319 (Fed. Cir. 1997).  Undisputed allegations in a complaint are "normally consider[ed] . . . to be true and correct," but a defendant may challenge the truth of any jurisdictional facts.  **Reynolds v. Army & Air Force Exch. Serv.**, 846 F.2d 746, 747 (Fed. Cir. 1988).  A court may consider evidence to resolve any factual disputes regarding those facts.  *Id.*

Defendant has also moved to dismiss for failure to state a claim on which relief can be granted under RCFC 12(b)(6).  To survive such a motion, a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  **Ashcroft v. Iqbal**, 129 S. Ct. 1937, 1949 (2009).  In ruling on such a motion, a "court must accept as true the complaint's undisputed factual allegations and should construe them in a light most favorable to the plaintiff."  **Cambridge v. United States**, 558 F.3d 1331, 1335 (Fed. Cir. 2009).

2.  *Takings Claims Must Ripen Before They are Suitable for Review.*

Before this Court—or any court—can hear a takings claim, that claim must have ripened.  *See* **Howard W. Heck & Assocs., Inc. v. United States**, 134 F.3d 1468, 1471 (Fed. Cir. 1998); *see also* **Nat'l Park Hospitality Ass'n v. Dep't of Interior**, 538 U.S. 803, 807–08 (2003) (discussing why courts refuse to exercise jurisdiction over unripe claims).

A regulatory takings claim does not ripen "until the government entity charged with implementing the regulations has reached a final decision regarding

7

the application of the regulations to the property at issue." ***Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank***, 473 U.S. 172, 186 (1985).  A court must know "to a reasonable degree of certainty what limitations the agency will, pursuant to regulations, place on the property." ***Morris v. United States***, 392 F.3d 1372, 1376 (Fed. Cir. 2004).  If an agency has "procedures for obtaining a final decision, a takings claim is unlikely to be ripe until the property owner complies with those procedures." *Id.*

The ripeness doctrine "does not require a landowner to submit applications for their own sake." ***Palazzolo v. Rhode Island***, 533 U.S. 606, 622 (2001).  The key is simply to know "how far the regulation goes" and how it applies to the property at issue. ***MacDonald, Sommer & Frates v. Yolo Cnty.***, 477 U.S. 340, 348 (1986).  Until this is known, "'it is impossible to tell whether the land retain[s] any reasonable beneficial use or whether [existing] expectation interests [have] been destroyed.'"  *Id.* at 349 (quoting ***Williamson Cnty.***, 473 U.S. at 190 n.11).  Toward this end, a plaintiff must allow the relevant authority "the opportunity, using its own reasonable procedures, to decide and explain the reach of a challenged regulation." ***Palazzolo***, 533 U.S. at 620.

A failure to obtain a final decision may be excused under either the administrative futility or extraordinary delay exceptions to ripeness.  Generally, a property owner must comply with administrative processes where those processes "could reasonably result in a more definite statement of the impact of the regulation." ***Morris***, 392 F.3d at 1376.  In the narrow circumstance "'in which the administrative entity has no discretion regarding the regulation's applicability and its only option is enforcement,'" courts will not require a plaintiff to pursue further administrative processes. *Id.* (quoting ***Greenbrier v. United States***, 193 F.3d 1348, 1359 (Fed. Cir. 1999)).  This administrative futility exception is narrow and is designed to prevent a plaintiff from having to "'submit *multiple* applications when the manner in which the first application *was rejected* makes it clear that no project will be approved.'" ***Howard W. Heck***, 134 F.3d at 1472 (quoting ***S. Pac. Transp. Co. v. City of Los Angeles***, 922 F.2d 498, 504 (9th Cir. 1990)).

Extraordinary delay in the government's permitting process may also excuse a failure to obtain a final decision. ***Boise Cascade Corp. v. United States***, 296 F.3d 1339, 1352 (Fed. Cir. 2002).  The relevant delay must be truly "extraordinary," and the Federal Circuit has called an eighteen-month delay in one case "far short of extraordinary." ***Appolo Fuels, Inc. v. United States***, 381 F.3d 1338, 1351 (Fed. Cir. 2004); *see also* ***Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency***, 535 U.S. 302, 306 (2002) (finding that a thirty-two month delay was not extraordinary); ***Wyatt v. United States***, 271 F.3d 1090, 1097 (Fed. Cir. 2001) (finding that a ten-year delay was not extraordinary).  It is a "rare circumstance" to find an extraordinary delay without also finding bad faith on the part of the government. ***Wyatt***, 271 F.3d at 1098.

### 3. *Is McGuire's Claim Ripe?*

The Ninth Circuit found McGuire's claim ripe. *McGuire*, 550 F.3d at 910. The parties, however, dispute the effect that decision should have on this Court.

### a. Once a Court Decides an Issue, that Decision Becomes the Law of the Case.

McGuire argues that the law of the case doctrine requires this Court to follow the Ninth Circuit's decision. "As most commonly defined, the doctrine [of the law of the case] posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Arizona v. California*, 460 U.S. 605, 618 (1983). Both a court's own decisions and the decisions of other courts in the same case become the law of the case. *See Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988). Courts are "routinely" called upon to "apply law-of-the-case principles to transfer decisions of coordinate courts." *Id.* Even jurisdictional decisions receive law of the case treatment, and the Supreme Court has stated that "no reason" exists to apply law of the case principles "less rigorously to transfer decisions that implicate the transferee's jurisdiction." *Id.* at 816 n.5.

### i. *The Law of the Case Doctrine is Not the Same as Res Judicata.*

The doctrines of law of the case and *res judicata* differ, although the parties' arguments have not always heeded this difference. The government has argued that the Court should "'override [] *res judicata*.'"[17] According to the government, overriding the decision is particularly appropriate in this case since "'[a]llowing the judgment to stand would substantially infringe the authority of another tribunal or agency of government.'"[18]

These doctrines are related, but not identical. *Res judicata* bars the relitigation of issues in *subsequent* litigation, while the law of the case directs a court's discretion in the *same* litigation. *See S. Ry. Co. v. Clift*, 260 U.S. 316, 319 (1922) ("[T]here is a difference between [law of the case] and res adjudicata."). In the case around which the government centers its argument, the Court of Appeals for the Fifth Circuit acknowledged it lacked jurisdiction over a claim against the government but nevertheless issued a "predicate" judgment. *Christopher Vill., L.P. v. United States*, 360 F.3d 1319, 1324 (Fed. Cir. 2004). In a *subsequent* lawsuit, the Court of Federal Claims refused to be bound by *res judicata* to a judgment issued by a court without jurisdiction, and the Federal Circuit affirmed. *Id.* at 1321. In this case, McGuire does not attempt to use a

---

[17] Def.'s Mot. 16 (quoting *Christopher Vill., L.P. v. United States*, 360 F.3d 1319, 1332 (Fed. Cir. 2004)).

[18] *Id.* (quoting *Christopher Vill.*, 360 F.3d at 1330) (internal quotations removed).

judgment in a prior case to bind the parties in the present one.  Instead, he asks the Court to not overturn a decision already made in this case.

*ii.   How Much Deference is Due?*

An issue that has been decided in a case becomes the law of the case and influences later decisions in two different, though closely related ways.  First, when an appellate court decides an issue, that decision binds the lower court from which the case was appealed.  *See In re Sanford Fork & Tool Co.*, 160 U.S. 247, 255 (1895) (noting that when an appellate court decides a case the lower court "is bound by the decree as the law of the case"); ***Exxon Corp. v. United States***, 931 F.2d 874, 877 (Fed. Cir. 1991) ("Law of the case, then, merely requires a trial court to follow the rulings of an appellate court.").  Second, when a court itself, or a "coordinate court" in a transferred case, has decided an issue, then a court "should be loathe" to revisit the decision, although it is not binding. ***Christianson***, 486 U.S. at 817.  In the latter situation, revisiting a decision would be improper "in the absence of extraordinary circumstances such as where the initial decision was 'clearly erroneous and would work a manifest injustice.'"  *Id.* (quoting ***Arizona***, 460 U.S. at 618 n.8); *see also **Federal Air Marshals v. United States***, 84 Fed. Cl. 585, 590 (2008).

The procedural posture of this case is somewhat unusual and has led to arguments from the parties that touch on both levels of deference.  Under normal circumstances, the Court of Federal Claims receives transferred cases from federal district courts and must consider the law of the case effect of those district courts' decisions.  *See, e.g.*, ***Taylor v. United States***, 73 Fed. Cl. 532, 538 (2006) (reviewing the decision of the United States District Court for the Central District of California to transfer a case to the Court of Federal Claims).  This clearly falls under the second type of deference, as federal district courts are "coordinate" to this Court, and their decisions are not binding upon it.

McGuire, however, argues that the first, binding type of deference should apply in this case, since a decision was reached by an appellate court.[19]  The Court disagrees.  The appellate court that issued the decision was the appellate court from another circuit.  The decisions of the Federal Circuit, not the Ninth Circuit, are binding on this Court.  *See **Coltec Indus., Inc. v. United States***, 454 F.3d 1340, 1353 (Fed. Cir. 2006).

The government argues that the second, non-binding type of deference applies.  The Court agrees, but notes a confusion with the terminology usually used to describe this type of deference.  In *Christianson* and other cases, this type of deference is applied to the review of a court's own decisions or decisions of "coordinate courts" in the same suit.  486 U.S. at 816.  In this case, the decision in question was reached neither by the court itself nor a "coordinate court," since the Court of Appeals for the Ninth Circuit, as an appellate court, is coordinate to the Court of Appeals for the Federal Circuit.  *See **Biotechnology Indus. Org. v.***

---

[19] Pl.'s Resp. 2.

***District of Columbia***, 496 F.3d 1362, 1369 n.1 (Fed. Cir. 2007) ("*Christianson* directs *appellate courts* to apply the law of the case doctrine and defer to *sister Circuits'* jurisdictional determinations upon a transfer.") (emphasis added).

A similar procedural path appears in ***Doko Farms v. United States***, 861 F.2d 255 (Fed. Cir. 1988), and suggests that the deference appropriate to a "coordinate court" should apply here. In that case, a suit was brought in federal district court and appealed to the Fifth Circuit, which held that the district court lacked jurisdiction, and transferred the case to the United States Claims Court. *Id.* at 256. The Claims Court, however, conducted an "independent evaluation" that did not treat the Fifth Circuit's decision as the law of the case, and retransferred the case. *Id.* The Federal Circuit held that the Claims Court erred and that "[t]he decision of the Fifth Circuit . . . is the law of the case." *Id.* The court also stated that it did not need to analyze the Claims Court's reasons for retransfer, but noted "that the decision of the Claims Court was rendered prior to the decision of the Supreme Court in *Christianson*." *Id.* at 256. This language strongly suggests that the rule in *Christianson* for "coordinate courts" would have been relevant and applicable to the Claims Court's consideration of the Fifth Circuit decision.

Finally, defendant argues that no deference is due because the Ninth Circuit lacked jurisdiction and their decision on ripeness was merely dicta. Only issues that were "actually decided, either explicitly or by necessary implication," are considered the law of the case. ***Toro Co. v. White Consol. Indus., Inc.***, 383 F.3d 1326, 1335 (Fed. Cir. 2004). In this case, the Ninth Circuit wrote that "judicial economy and courtesy to transferee courts dictates" the resolution of the threshold issue of ripeness prior to transfer, and that "it would be inappropriate to transfer a case that we did not consider ripe for adjudication." ***McGuire***, 550 F.3d at 910 n.3. The court then looked to the "uncontested district court jurisdiction over the bankruptcy" and the "authority from the Federal Circuit Court of Appeals indicating that the district court had jurisdiction over the Tucker Act claim," even though the Ninth Circuit found that authority to be erroneous. *Id.* at 913–14 (discussing and rejecting *Quality Tooling*). Relying on those two factors, the appellate court transferred the case to this Court, under 28 U.S.C. § 1631, which allows a transfer to cure want of jurisdiction if a court finds that transfer "is in the interests of justice" and that the case "could have been brought" in the transferee court. Given this reasoning, the Court will not disregard the Ninth Circuit's analysis as dicta.

The Court, therefore, holds that the decision of the Ninth Circuit is the law of the case and that it is appropriate to review that decision under the principles outlined in *Christianson*.

### b. Do "Extraordinary Circumstances" Compel the Court to Overturn the Ninth Circuit's Decision?

Since the decision in *Christianson* controls, the Court may "revisit" the Ninth Circuit's decision, but will not change the outcome of that decision, unless "extraordinary circumstances" apply, such as if the Ninth Circuit's decision was

"'clearly erroneous and would work a manifest injustice.'"[20] *Christianson*, 486 U.S. at 817 (quoting *Arizona*, 460 U.S. at 618 n.8). If the Ninth Circuit's decision is clearly erroneous, it would be reversible error for the Court to let it stand. *See, e.g.*, *Rodriguez v. United States*, 862 F.2d 1558, 1560 (Fed. Cir. 1988) (holding that it was error for the Claims Court to not retransfer a case that was improperly transferred to the court).

The regulations in force at the time the bridge at Eighth Avenue was removed provided guidance for the construction of bridges. Under those regulations,

> [S]tructures crossing or encroaching on project canal, lateral or drain rights-of-way which are needed for private use may be constructed privately in accordance with plans approved by the Officer-in-Charge . . . . Such structures will be constructed and maintained under revocable permits on proper forms issued by the Officer-in-Charge of the irrigation project to the party or parties desiring such structures.

25 C.F.R. § 171.9(c) (1999). On three separate occasions, the BIA informed McGuire that he could apply for one of these permits by submitting plans in accordance with the regulations to Anspach, the Officer-in-Charge.[21] The BIA in practice, however, did not use a formal process for the submission of applications, and Anspach himself "had never personally received a written proposal during his tenure at the BIA." *McGuire*, 550 F.3d at 909. At trial, Anspach described the BIA's process in this way:

> Somebody wants to put in a bridge, they come to us and say, "We'd like to put a bridge here. And can you help us come up with some plans and specs[?]" Or "Here are my proposed plans and specs. What do you think?" And then we have our engineers and staff look at it and go from there.[22]

In a letter to McGuire that informed him of the bridge removal, Anspach told him to contact Ted Henry if he had any questions.[23] McGuire did contact Henry, as well as Hinkins, and discussed the bridge removal and a new bridge with them. According to McGuire, they informed him that they could not make a final decision, only Anspach could, but Anspach never replied to any contact from McGuire. As the Ninth Circuit noted, McGuire also challenged the removal

---

[20] The government also argues that, whatever the law of the case, a court still has an obligation to examine its own jurisdiction. This argument is merely axiomatic. In every case, a court has the responsibility to ensure that it has subject matter jurisdiction. *See* *View Eng'g, Inc. v. Robotic Vision Sys., Inc.*, 115 F.3d 962, 963 (Fed. Cir. 1997). That obligation is no different here.

[21] Def.'s Mot. Ex. 5; *id.* at Ex. 7; *id.* at Ex. 8.

[22] Pl.'s Resp. Ex. 1 at 300.

[23] Def.'s Mot. Ex. 5.

decision in tribal court, where the BIA did not appear, and unsuccessfully appealed the lease cancellation within the BIA. *McGuire*, 550 F.3d at 907. After McGuire left the property, the subsequent tenant applied for and received a permit, which allowed him to construct a new bridge.

The Ninth Circuit found that McGuire "did everything reasonably within his power to prevent removal of the bridge and, when those efforts proved ineffective, to build a new one." *Id.* at 909. Therefore, the Ninth Circuit held that the claim was ripe. *Id.* at 910. McGuire similarly argues before this Court that the government reached a "final" decision when it removed the bridge.[24] Anspach himself referred to the decision to block and remove the bridge as "final," although he did not address McGuire's request for a new bridge.[25]

McGuire could have done more to obtain permission for a new bridge. He could have, for instance, submitted a permit application, as the tenant after him did, or he could have more actively pursued the informal process the BIA used. As defendant pointed out at oral argument, McGuire testified that he discussed with BIA officials a replacement bridge and drew a sketch of it prior to October 1999, but he was informed by letter in November 1999 that he needed to apply for a permit in order to replace the bridge.[26] A reasonable person might have known that more steps were needed to apply for a permit to construct a new bridge.

If the Court were called on to look at this issue anew, it might reach a different decision, but a decision in this case has already been made. A consequence of the law of the case in transferred cases is that judges must, at times, follow decisions that they themselves would not have made. This is appropriate:

> If the law-of-the-case doctrine is to have any substance, it must sometimes require a judge to uphold a ruling on a question that the

---

[24] McGuire also argues that he does not need to obtain a "final decision" because of the extraordinary delay and futility exceptions, neither of which the Ninth Circuit addressed. The Court disagrees. McGuire first orally requested permission for a new bridge sometime after February 1999. The old bridge was removed in January 2000, and McGuire's lease was cancelled in August 2000. A court considering whether or not a delay is extraordinary looks at three basic factors: length of the delay; presence of bad faith; and reasons for the delay. *See Bass Enters. Prod. Co. v. United States*, 381 F.3d 1360, 1366–67 (Fed. Cir. 2004). Under the most charitable interpretation of the facts and arguments, McGuire suffered a delay from February 1999 to August 2000. This short time frame, coupled with the absence of bad faith and the safety concerns behind the regulatory action, does not constitute an extraordinary delay. Furthermore, the administrative futility exception does not apply, since that exception, as discussed above, protects a claimant from having to submit multiple applications. *Howard W. Heck*, 134 F.3d at 1472.

[25] Def.'s Mot. Ex. 8.

[26] Oral Argument Tr. at 9:6–9:14, Jan. 19, 2011.

judge would decide the other way if it were presented for the first time. . . . [T]he doctrine strongly discourages reconsideration of issues [that have been] addressed, fully considered, and decided.

*Hughes Aircraft Co. v. United States*, 86 F.3d 1566, 1578 (Fed. Cir. 1996) (Bryson, J., concurring).  The Ninth Circuit decided, and the parties briefed, the ripeness issue.  The Court does not find that any extraordinary circumstances compel it to overturn the decision, and will therefore abide by it.

### B.  Motion for Summary Judgment

The government has also moved for summary judgment and argues that, even if the Court finds the case ripe for review, McGuire cannot meet the Federal Circuit's standards for a taking.

### 1.  *Standard of Review*

Summary judgment is appropriate when, after drawing all reasonable inferences in favor of the non-movant, no genuine issue of material fact exists for trial, and the movant is entitled to judgment as a matter of law.  RCFC 56(c)(1); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Consol. Coal Co. v. United States*, 615 F.3d 1378, 1380 (Fed. Cir. 2010).  The party moving for summary judgment has the initial responsibility of demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A fact is material if it "might affect the outcome of the suit," and a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248; *Long Island Sav. Bank, FSB v. United States*, 503 F.3d 1234, 1244 (Fed. Cir. 2007).  Once that showing has been made, however, responsibility falls on the nonmoving party to respond and show the presence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 324.  To establish a genuine issue of material fact, a party "must point to an evidentiary conflict created on the record; mere denials or conclusory statements are insufficient."  *SRI Int'l v. Matsushita Elec. Corp. of America*, 775 F.2d 1107, 1116 (Fed. Cir. 1985).  If the nonmoving party fails to make this showing, entry of summary judgment is "mandate[d]."  *Celotex*, 477 U.S. at 322.

### 2.  *The Federal Circuit Uses a Two-Step Test to Analyze Takings.*

The Takings Clause of the Fifth Amendment bars private property from being "taken for public use, without just compensation."  U.S. CONST. amend. V.  This provision aims to prevent the "[g]overnment from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole."  *Armstrong v. United States*, 364 U.S. 40, 49 (1960).

The Federal Circuit uses a two-step test to analyze takings.  A court first looks at what was allegedly taken and inquires whether or not a plaintiff has a property interest in it that is legally cognizable for purposes of the Fifth Amendment.  *Schooner Harbor*, 569 F.3d at 1362.  If a plaintiff does have such an interest, a court then determines whether or not the property interest was

actually "taken." ***Acceptance Ins. Cos., Inc. v. United States***, 583 F.3d 849, 854 (Fed. Cir. 2009). Although early takings cases dealt primarily with the physical invasions of private property, courts now recognize that a regulation can also amount to a compensable taking. *See **Lingle v. Chevron U.S.A., Inc.***, 544 U.S. 528, 537 (2005).[27] In *Pennsylvania Coal Co. v. Mahon*, Justice Holmes wrote that "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." 260 U.S. 393, 415 (1922). The key question in regulatory takings cases is how far is "too far," and, as discussed below, courts have fashioned several tests to answer this question.

### 3. *Does McGuire Have a Legally Cognizable Property Interest?*

The Fifth Amendment does not specify or create the property interests that it protects, and no rigid test exists for determining whether a property interest is legally cognizable. *See **Air Pegasus of D.C., Inc. v. United States***, 424 F.3d 1206, 1213 (Fed. Cir. 2005). Instead of a rigid test, a court identifies "the use interest proscribed by the governmental action" and determines whether that use "was part of the owner's title to begin with, *i.e.*, whether the land use interest was a 'stick in the bundle of property rights' acquired by the owner." ***M & J Coal Co. v. United States***, 47 F.3d 1148, 1154 (Fed. Cir. 1995) (citing ***Lucas***, 505 U.S. at. 1027). To answer this question, a court looks to "existing rules and understandings and background principles derived from an independent source, such as state, federal, or common law, [to] define the dimensions of the requisite property rights for purposes of establishing a cognizable taking." ***Air Pegasus***, 424 F.3d at 1213 (internal quotations removed). These background principles include the regulatory framework as well as the classic rights of possession, use, exclusion, and transfer. *See **Members of Peanut Quota Holders Ass'n v. United States***, 421 F.3d 1323, 1330–31 (Fed. Cir. 2005) ("[A] compensable interest is indicated by the absence of express statutory language precluding the formation of a property right in combination with the presence of the right to transfer and the right to exclude.").

---

[27] At oral argument, McGuire's counsel briefly argued that there was a compensable physical taking. Oral Argument Tr. at 35:4–19. Counsel suggested that a physical taking could occur when the government has blocked the entrance to a property, without actually entering the property. *Id.* Since oral argument was the first time McGuire has suggested that a physical taking occurred, the issue has not been briefed by the parties, and an extensive discussion of it is unnecessary at this time. The Court notes, however, that the Federal Circuit recently described the "clear line between physical and regulatory takings"; physical takings "involve a physical occupation or destruction of property, while [regulatory takings] involve restrictions on the use of property." ***CRV Enters., Inc. v. United States***, 626 F.3d 1241, 1246 (Fed. Cir. 2010). *See also id.* at 1248 n.6 (citing ***Warren v. City of Athens***, 411 F.3d 697, 705 (6th Cir. 2005) (finding no physical taking where the government did not "physically encroach[] on [plaintiffs'] property")). Without an actual encroachment onto property, a physical taking is unlikely to be found.

The first step in determining whether a plaintiff has alleged a cognizable property interest is to "identify what, if anything, was the subject of the alleged taking." *Acceptance Ins.*, 583 F.3d at 855. That inquiry in this case is needlessly thorny, due to the parties' lack of specificity and McGuire's failure to, even once, discuss this critical first step of a takings analysis in any of his submissions to the Court. The Court notes, again, that this step is foundational and that only "if the court concludes that a cognizable property interest exists" may it proceed to the second step of the takings analysis. *Id.* at 854.

The parties have discussed a variety of property interests. Defendant, at times, has argued that the property interest at issue is the "right to use the bridge for access to the northern portion of the lease,"[28] while, at other times, defendant has focused on a property interest in the specific, unsafe bridge that was removed.[29] McGuire's filings, at times, seem to assert that the government took a property interest he had in the bridge itself,[30] while at other times asserting that denial of the use of a bridge took his interest in the leased property.[31] At oral argument, McGuire's counsel stated that "the right to use the bridge" was a "property right" that was "cognizable" and "compensable."[32] At the end of the day, however, McGuire's request for compensation focuses on the farm lease and lost crops, not on any compensation for the bridge itself.

In assessing whether or not a Fifth Amendment property interest exists, the Federal Circuit looks for "crucial indicia of a property right," such as the ability to sell, assign, transfer, or exclude. *Conti v. United States*, 291 F.3d 1334, 1342 (Fed. Cir. 2002). Where a desired use is dependent upon revocable government permits, a property interest is likely lacking. *See Am. Pelagic Fishing Co. v. United States*, 379 F.3d 1363, 1381 (Fed. Cir. 2004) (no property interest where the use claimed was not "inherent in [the] ownership of the" property but, instead, dependent upon permits); *Mitchell Arms, Inc. v. United States*, 7 F.3d 212, 217 (Fed. Cir. 1993) (no property interest where government denied authorization for plaintiff to sell some of his property). For instance, in *Colvin Cattle Co. v. United States*, the plaintiff sued for a taking of his ranch because the government denied him a permit to allow his cattle to graze on nearby government property; the Federal Circuit found that any loss to his land was not compensable because the loss did not occur "by virtue of governmental

---

[28] Def.'s Mot. 21.

[29] Def.'s Mot. 33–34 (arguing that the bridge itself constituted a nuisance and thus could be removed without compensation).

[30] *See* Pl.'s Resp. 13 (noting "the taking of *his* bridge") (emphasis added); *id.* at 3–4 (noting that "[a]s a result" of the "remov[al]" of the bridge, McGuire's lease was terminated); Compl. 8 ("The taking occurred because and when the bridge was removed, and it was not replaced Defendants [sic], and when McGuire's request for its replacement was not granted.").

[31] *See* Compl. 8 (noting that "the lease, the value of his improvements to the lease, and his growing crop were taken").

[32] Oral Argument Tr. at 34:24–35:2.

restrictions on a constitutionally cognizable property interest."  468 F.3d 803, 808 (Fed. Cir. 2006).

Summary judgment on this issue is premature.  The lease subjects McGuire's property interest to "any prior, valid, existing claim or rights-of-way, including the present existing roads," but also guarantees McGuire "ingress and egress to the leased premises over existing roadways under the possession and control of the [CRIT]."[33]  The parties dispute whether the CRIT owns the bridge. If it does own the bridge, the lease could guarantee to McGuire the right to use the bridge for access to his land.  More broadly, McGuire's claim is that government action hindered his ability to farm land in which he clearly had a legally cognizable property interest.  On the other hand, McGuire faces a steep burden in showing that his desired use of the bridge is not foreclosed by the regulatory regime, which specifically deals with crossings constructed over BIA rights-of-way.  Testimony from those involved and further ventilation of these facts will aid in the resolution of this issue, and summary judgment is therefore denied.

## 4.   *Was There a Compensable Taking by Loss of Access?*

Government action that cuts off or denies "all feasible routes" of access to a plaintiff's property can constitute a taking.  *See **Laney v. United States***, 661 F.2d 145, 149 (Ct. Cl. 1981).  For instance, in *Foster v. United States*, the plaintiff owned mineral rights on a military base, but the government refused access to that base.  607 F.2d 943, 947 (Ct. Cl. 1979).  The court found a taking because the government permanently denying all access to the property.  *Id.* at 950.  The Court of Claims in *Laney v. United States* gives the example of a city block surrounded on four sides by public streets: if the government cuts off access from one side, there is no taking, "even if the economic fruitfulness of the block is substantially impaired."  ***Laney***, 661 F.2d at 149.  If, however, the government cuts of access from all four sides, then a taking has occurred.  *Id.*

McGuire argues that the northern portion of his property was taken by loss of access.  His own testimony, however, shows that he could still access that land, albeit less profitably.[34]  On the other hand, McGuire has extensively testified about the difficulty of using other routes of access.[35]  Due to that difficulty, those routes may not have been "feasible" for his use.  ***Laney***, 661 F.2d at 149.  This testimony raises a triable issue of fact, and summary judgment is thus premature.

## 5.   *Was There a Compensable Regulatory Taking?*

Courts have identified three basic varieties of regulatory takings cases to answer the question of whether a regulation goes "too far."  The first two are relatively narrow categorical or *per se* takings.  First, a regulation that requires

---

[33] Def.'s Mot. Ex. 1, at 3, 10.

[34] Pl.'s Resp. Ex. 1, at 233 ("It's not impossible.  We can haul [hay] out in pickup loads three bails [sic] at a time.").

[35] *Id.* at 104–115.

even a minor permanent physical invasion of property will necessitate compensation. *See Lingle*, 544 U.S. at 538; *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 441 (1982). As discussed above, there was no physical invasion of McGuire's property. Second, if a landowner is deprived of "all economically beneficial us[e]" of his property by a regulation, compensation is due. *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1019 (1992). Such a "total" taking must be compensated, "except to the extent that 'background principles of nuisance and property law' independently restrict the owner's intended use of the property." *Lingle*, 544 U.S. at 539 (quoting *Lucas*, 505 U.S. at 1026–32).

The third category falls under the standards of *Penn Central Transportation Co. v. City of New York*. 438 U.S. 104 (1978). That case does not set a rigid test for regulatory takings but simply provides several factors of "particular significance" in deciding when "'justice and fairness' require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons." *Id.* at 124. These factors include "'[t]he economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations.'" *Lingle*, 544 U.S. at 538–39 (quoting *Penn Cent.*, 438 U.S. at 124). Additionally, the "'character of the governmental action'—for instance whether it amounts to a physical invasion or instead merely affects property interests through 'some public program adjusting the benefits and burdens of economic life to promote the common good'" must be considered. *Id.* (quoting *Penn Cent.*, 438 U.S. at 124); *see also Schooner Harbor*, 569 F.3d at 1362.

a. Categorical Taking under *Lucas*

In his response, McGuire briefly argues that a categorical taking under *Lucas* occurred.[36] He alleges that the loss of the bridge deprived the property of "all economically beneficial or productive use" and that he "could not generate income" without the bridge.[37] He further argues that the removal of the bridge caused his lease to have a "negative market value" because "the southern portion was destined to fail to generate enough crop and resulting income to make the lease payment."[38]

The requirements for a categorical taking are stringent. A total deprivation of "*all* economically beneficial or productive use[s]" of a property must occur, not just a deprivation of a claimant's desired use. *Lucas*, 505 U.S. at 1015 (emphasis added); *Bair v. United States*, 515 F.3d 1323, 1326 (Fed. Cir. 2008). At trial, McGuire testified that it was "not impossible" for him to continue farming alfalfa; he would just be "less competitive" and less profitable.[39] He also

---

[36] Pl.'s Resp. 26.

[37] *Id.*

[38] *Id.*

[39] Pl.'s Resp., Ex. 1 at 233.

admitted that he could farm wheat instead of alfalfa, although wheat was not profitable enough to make the lease payments.[40]   Given his testimony that some productive use remained, McGuire has failed to raise a genuine issue of material fact, and summary judgment in the government's favor is therefore mandated.

b.   Partial Regulatory Taking under *Penn Central*

Since no categorical taking occurred, the Court must analyze McGuire's claim under the *Penn Central* factors.  Under this *ad hoc* test, a court balances the relative weights of three primary factors: the economic impact on the claimant; the reasonable, investment-backed expectations of the claimant; and the character of the governmental action.  ***Penn Cent.***, 438 U.S. at 124.

*i.   The Economic Impact on the Claimant*

McGuire argues that he suffered a "severe economic injury," since the removal of the bridge prevented him from farming the northern portion of his property.[41]   The southern portion, according to McGuire, "generated a lower yield and could not generate enough revenue to cover the overall lease payment."[42]  Thus, according to McGuire, "the government's actions made it impossible for [him] to use the overall leased property in an economically feasible manner."[43]  McGuire also cites to testimony from the trial in bankruptcy court where he discussed the difficulty his haulers experienced in trying to use the alternate routes.[44]   The government, on the other hand, points to the expert report of Dr. Allen that was developed during discovery in this Court.  Dr. Allen's report finds that McGuire could have made renovations to his property that would have allowed him to continue harvesting hay, and that these renovations would have cost him between $30,266 and $78,600.

Summary judgment on this issue is premature.  The parties disagree as to the measure of economic loss that McGuire suffered.  A loss of enormous gravity would counsel in favor of McGuire, while a slight loss would counsel in favor of the government.  The resolution of this factual dispute would affect the balancing of *Penn Central*, and this dispute is thus material to the outcome of the litigation.  *See **Anderson***, 477 U.S. at 248.

*ii.   The Extent of Interference with Reasonable, Investment-Backed Expectations*

The analysis of this factor focuses on reasonable, objective expectations, rather than a claimant's subjective expectations or hopes for a property.  *See **Ruckleshaus v. Monsanto Co.***, 467 U.S. 986, 1005–06 (1984); ***Chancellor***

---

[40] *Id.* at 139.

[41] Pl.'s Resp. 24.

[42] *Id.* at 25.

[43] *Id.*

[44] Pl.'s Resp. Ex. 1, at 104–115.

*Manor v. United States*, 331 F.3d 891, 904 (Fed. Cir. 2003) (noting that a claimant's subjective expectations are "irrelevant").   One element that forms those expectations is the "regulatory regime in place at the time the claimant acquire[d] the property at issue." *Appolo Fuels*, 381 F.3d at 1349 (internal quotations removed).   There is, however no "blanket rule" that prevents a claimant from challenging a regulation of property that was in effect at the time the claimant acquired an interest in the property. *Rith Energy, Inc. v. United States*, 270 F.3d 1347, 1350 (citing *Palazzolo*, 533 U.S. at 628).   Though, at times, a "factual hearing" may be required to determine whether any reasonable expectations exist, at other times no such hearing is required, and a court may just examine the regulatory regime in place at the time of acquisition. *Appolo Fuels*, 381 F.3d at 1350.

According to defendant, McGuire did not have a reasonable investment-backed expectation in the use of the bridge to access the northern portion of the property because the regulations in place allowed the BIA to revoke any permits for the bridge.   McGuire, on the other hand, argues that he "reasonably expected to harvest alfalfa on the entire leased premises for the remainder of the lease."[45] The bridge had been in place for decades, and McGuire testified that BIA officials told him he would be responsible for maintaining it.   At trial, McGuire testified that in January 1995 the superintendent of the CRA who served prior to Anspach had told McGuire, "Remember, this is your bridge, your responsibility.   It does not belong to the Tribe or to BIA."[46]   The CRIT also appear to have had the impression that the bridge would remain; they noted in a letter to Anspach on December 9, 1998 that former BIA personnel told them that BIA's "Irrigation [Operation & Maintenance division] would incur a liability if they made an attempt to maintain or remove the bridge."[47]

Summary judgment on this issue is premature.   Although the regulatory regime certainly will shape whether or not McGuire's expectation was reasonable, testimony from the prior trial indicates that BIA officials may have given McGuire the impression that the bridge would remain, as it had for prior decades. A reasonable person may have understood from those decades of existence, and from the lease, that CRIT was authorizing his continued use of the bridge. Further factual development will aid in the resolution of this issue.

### iii.   The Character of the Governmental Action

As part of the character prong of *Penn Central*, a court considers "the actual burden imposed on property rights," the allocation of that burden, and "the magnitude or character of the burden a particular regulation imposes upon private property rights." *Lingle*, 544 U.S. at 542–43; *see also Rose Acre Farms, Inc. v. United States*, 559 F.3d 1260, 1276–77 (Fed. Cir. 2009) (discussing the character prong of *Penn Central* after the Supreme Court's decision in *Lingle*).   According

---

[45] Pl.'s Resp. 25.

[46] Pl.'s Resp. Ex. 1, at 265–66; *id.* at 525.

[47] *Id.* at 520.

to *Penn Central* itself, a taking "may more readily be found when the interference with property can be characterized as a physical invasion by government . . . than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." ***Penn Cent.***, 438 U.S. at 124.

Some aspects of the character prong clearly favor the government in this case, since the bridge was removed by the government due to concerns over its safety.[48]   The burden of removing the bridge was felt most keenly by McGuire, but, as discussed by Dr. Allen, he may have had several options for dealing with the removal of the bridge.

In response, McGuire makes two arguments, both of which are explicitly contradicted by case law.  McGuire argues that the character factor "considers in part whether the regulation advances a legitimate public purpose."[49]   This assertion, however, is based on and cites to the substantive due process standard of *Agins v. City of Tiburon*, 447 U.S. 255 (1980), which has been explicitly overruled.   Over the years, takings cases became muddled with due process standards, and courts began to ask in takings cases whether a legitimate state interest was advanced.  *See Lingle*, 544 U.S. at 540–41.  In *Lingle v. Chevron U.S.A., Inc.*, the Supreme Court clarified and untangled these precedents.  *Id.*  The Court held that "the 'substantially advances' formula announced in *Agins* is not a valid method of identifying regulatory takings for which the Fifth Amendment requires just compensation."  *Id.* at 545; *see also Rose Acre*, 559 F.3d at 1276 ("In a unanimous retreat, the Supreme Court discarded the 'substantially advances' test set forth in *Agins v. City of Tiburon*.").  McGuire, however, cites to *Agins* and asks this Court to review whether the "regulation advances a legitimate public purpose."[50]   The Court will not follow an explicitly disallowed line of reasoning.

McGuire also attacks the decision to remove the bridge, but a takings case is an inappropriate vehicle for such an argument.   McGuire argues that the government removed the bridge based on "inadequate evidence that it was not safe" and lists numerous reasons why the evidence was inadequate.[51]   These types of collateral attacks are barred in takings cases, since "in a takings case [the Court] assumes that the underlying governmental action was lawful" and "decide[s] only whether the governmental action in question constituted a taking for which compensation must be paid."  ***Rith Energy***, 270 F.3d at 1352; s*ee **M & J Coal***, 47 F.3d at 1154 ("Neither the Court of Federal Claims nor this court may entertain a collateral challenge to the validity of [agency] actions.").

The Court, however, finds summary judgment on this issue to be premature.  Under *Penn Central*, the "magnitude" and allocation of the burden of

---

[48] *See* Def.'s Mot. Ex. 6.

[49] Pl.'s Resp. 23 (citing ***Agins v. City of Tiburon***, 447 U.S. 255, 260 (1980)).

[50] *Id.*

[51] *Id.* at 24.

a government action is relevant to the analysis of this factor, and in this case testimony concerning the burden and the alternate means of access mentioned in Dr. Allen's report will further develop this point.  *See* **Lingle**, 544 U.S. at 542–43.

### iv.   Was the Bridge a Nuisance?

Finally, the government contends that McGuire's operation of an unsafe bridge constituted a nuisance, and that removing it generated no liability.  "It is a settled principle of federal takings law that under the *Penn Central* analytic framework, the government may defend against liability by claiming that the regulated activity constituted a state law nuisance without regard to the other *Penn Central* factors."  **Appolo Fuels**, 381 F.3d at 1347.  The government must "identify background principles of nuisance and property law that prohibit" the desired uses of a plaintiff's property.  **Lucas**, 505 U.S. at 1031.  Under Arizona law, it is a public nuisance for anything "[t]o be injurious to health, indecent, offensive to the senses or an obstruction to the free use of property that interferes with the comfortable enjoyment of life or property by an entire community or neighborhood or by a considerable number of persons."  ARIZ. REV. STAT. ANN. § 13-2917(A)(1) (2010).

There is a disconnect between the government's nuisance argument, which focuses on use of an unsafe bridge, and its other arguments regarding *Penn Central*, which focus on the burden access by other routes placed on McGuire.  The Ninth Circuit found this case ripe for review because the government essentially denied McGuire's informal application to construct a new bridge, and this Court is abiding by that decision.  Presumably, McGuire would not have constructed a bridge so unsafe that it would have constituted a nuisance.  If, in further proceedings in this case, it is shown that McGuire wished to operate an unsafe bridge that fell within the prohibition of the Arizona statute, then judgment for the government may be appropriate, at that time.  Summary judgment is not appropriate at this time.

### III.   <u>Conclusion</u>

For the above stated reasons, the government's Motion To Dismiss is DENIED, and the government's Motion For Summary Judgment is DENIED in part and GRANTED in part.  Issues of material fact exist as to whether a legally cognizable property interest exists for purposes of the Fifth Amendment, as to whether a taking by loss of access occurred, and as to whether a regulatory taking occurred under *Penn Central*.  438 U.S. at 124.  The Court, however, finds that summary judgment for defendant is proper on the issue of McGuire's claim for a categorical taking under *Lucas*.  505 U.S. at 1015.  The Clerk is directed to act in accordance with the Court's ruling.

In addition, the parties shall submit to the Court by March 18, 2011 a Joint Status Report, including a proposed schedule of further proceedings in accordance with RCFC Appendix A, § VI.

No costs.

IT IS SO ORDERED.

**s/Bohdan A. Futey**
**BOHDAN A. FUTEY**
**Judge**
