# In the United States Court of Federal Claims

### No. 09-380L

### (Filed February 22, 2012)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**JERRY McGUIRE,**           \*
                                     \*
            **Plaintiff,**          \*
                                     \*
        v.                     \*
                                     \*
**UNITED STATES OF AMERICA**    \*
                                     \*
            **Defendant.**          \*

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

       ***David A. Domina***, Law Office of Domina Law Group, Omaha, NE, attorney of record for plaintiff.

       ***Jessica M. Held***, U.S. Department of Justice, Environmental and Natural Resources Division, Washington, D.C., with whom was ***Bruce K. Trauben*** and ***Assistant Attorney General Ignacia S. Moreno***, for defendant.

## OPINION & ORDER

***Futey,*** **Judge**.

       This case comes before the Court following a trial held in Phoenix, Arizona from September 13–15, 2011.  Plaintiff Jerry McGuire ("McGuire") claims that the government, through the Bureau of Indian Affairs ("BIA"), took his property without compensation in violation of the Fifth Amendment when it removed a bridge that crossed a BIA canal and allowed McGuire easy access to one portion of land that he leased.

I.     **Background**[1]

On January 1, 1995, Jerry McGuire signed a ten-year lease with the Colorado River Indian Tribes ("CRIT") for 1,355.76 acres of land in Parker, Arizona.  Allen Anspach, superintendent of the BIA's Colorado River Agency, approved the lease on behalf of the BIA.  McGuire intended to use the land to farm alfalfa.[2]  Although he had not previously used flood irrigation or leased a farm from an Indian tribe,[3] he grew up farming around Parker.[4]  Rent was set at $226,411.92 for the first five years.[5]

A.   The Leased Property and Lateral 19-R

A BIA canal known as Lateral 19-R bisects the leased property into two parts of nearly equal size.[6]  On either side of that canal, the BIA has a right-of-way.[7]  The BIA uses this right-of-way to maintain the canal.  Obstructions or debris in the canal can affect the water flow—and thus the success—for numerous farmers.  It is thus critical that BIA be able to access and control their canals.

Mohave Road is the "main thoroughfare" between Parker and Blythe, California, and it runs parallel to the BIA canal on the canal's south side.[8]  Although the southern portion of McGuire's leased property directly abuts Mohave Road, it is necessary to cross the BIA canal in order to access the northern portion of that property.

Three bridges cross the BIA canal near the leased property and allow access to the northern portion.  The first is at Eighth Avenue, which runs north from Mohave Road to Levee Road.[9]  The second is just to the southwest of the leased property at Tenth Avenue, which also runs north to Levee Road.[10]  The third and final bridge is just to the northeast of the leased property at Brown Road, which, like the other two roads, reaches Levee Road.[11]  Levee Road traces the

---

[1] The following constitute findings of fact in accordance with Rule 52(a) of the Rules of the United States Court of Federal Claims ("RCFC").  In citations, "DX" refers to defendant's exhibits, "PX" refers to plaintiff's exhibits, and "Trial Tr." refers to the trial transcript.

[2] DX1, at 3; Trial Tr. 62:24 (testifying that the planned crop was "[p]rimarily alfalfa").

[3] Trial Tr. 214:13–17.

[4] *Id.* at 36:5–25.

[5] DX1, at 4.

[6] Trial Tr. at 36:5–25, 42:22–43:1.

[7] 25 C.F.R. §171.12 (1999); *see also* Trial Tr. 399:4–9, 461:1–10.

[8] Trial Tr. 32:22.

[9] DX38, at 206; Trial Tr. 35:7.

[10] DX38, at 206.

[11] *Id.*  This bridge is sometimes referred to in testimony as the "FFA Bridge" due to its proximity to a Future Farmers of America building.

Colorado River on the northern border of the property McGuire leased, and connects to Tenth Avenue, Eighth Avenue, and Brown Road.[12]

Of the three bridges mentioned above, the Eighth Avenue Bridge is the only one that provides direct access to and from the northern and southern portions of McGuire's property.  The other two bridges require a traveler to either drive north to Levee Road, which connects to McGuire's farm via Eighth Avenue, or along the canal bank roads that run parallel to Lateral 19-R.  Ted Henry, Irrigation System Manager for BIA, testified that farmers used both of these access routes.[13]

### B.  The Eighth Avenue Bridge

The bridge at Eighth Avenue is located "inside the 19-R Canal, and inside the BIA right of way,"[14] and the BIA did not believe that the bridge was "part of Mr. McGuire's leased premises."[15]  The current bridge was built in 2002, but an earlier bridge ("the Eighth Avenue Bridge") sat atop the canal at the same location for several decades, and is the subject of this lawsuit.[16]  The bridge allows easy access between the northern and southern halves of the leased property, and McGuire testified that he would not consider the halves "contiguous" without the bridge.[17]  One document drafted on behalf of McGuire refers to "the bridge separating my client's leased properties."[18]

The exact date of the Eighth Avenue Bridge's construction is unknown, but it had spanned the canal since, at least, the 1970's.[19]  It thus existed at the outset of McGuire's lease.[20]  The exact provenance of the bridge is also unknown.[21]  One letter from CRIT suggested that the original developer of the farm may have constructed it.[22]  As McGuire's counsel acknowledged, however, the history of the bridge "has never absolutely been proven."[23]  When McGuire

---

[12] *Id.*

[13] Trial Tr. 368:10–12 (testifying that "hay equipment [and] hay trucks" used the Tenth Avenue Bridge), 372:2–3 (testifying that "hay equipment [and] hay trucks" crossed the Brown Avenue Bridge), 376:20–377:1 (testifying that hay trucks occasionally drove along canal bank roads), 426:22–427:19 (testifying that it was the "custom and practice" for people to use Levee Road and other farmers' farm roads).

[14] *Id.* at 360:19-20.

[15] DX47, at 115:18.

[16] Trial Tr. 43:24–44:1.

[17] *Id.* at 34:18–24.

[18] DX8, at 37.

[19] Trial Tr. 43:24–44:1 (noting that the bridge had been there since "[t]he '60s at least"), 488:24 (noting that the bridge had been there since "the seventies").

[20] *Id.* at 43:9.

[21] *See id.* at 513:24, 514:5–8.

[22] DX2, at 22.

[23] Trial Tr. 21:18.

took possession of the farm, the bridge was made of concrete and wood, with dirt approaches leading up to it.[24]

Many people, including McGuire and BIA employees, used the Eighth Avenue Bridge throughout the years.[25]  The BIA ran dump trucks over the bridge, and McGuire could not "control the dump truck traffic" even though he believed some of that traffic damaged the bridge.[26]

As an alfalfa farmer, McGuire used large trucks to haul away harvested alfalfa.[27]  At the end of a growing cycle, he stacked baled alfalfa hay on the northern side of the Eighth Avenue Bridge, and haulers crossed the bridge in order to pick up and haul away stacked hay.[28]  Because McGuire chose to stack baled hay at this particular location, the Eighth Avenue Bridge provided the easiest means of access to the stackyard from the southern portion of the property.[29]

## C.  The Removal of the Bridge

The BIA grew concerned with the safety of the bridge,[30] and Anspach informed McGuire in 1998 that the bridge would be removed because it was unsafe.[31]  Albert Trimels, the regional road maintenance engineer for the BIA,

---

[24] *Id.* at 43:12–15.

[25] *Id.* at 44:8–13.

[26] *Id.* at 83:10–12; *see also id.* at 83:13–15 (agreeing that "the bridge [was] accessible for use by BIA").

[27] *Id.* at 65:21–66:1 ("And then we follow that with a baler and make the bales. We follow that with a roadsider or a stinger.  Now they're using the big balers.  It picks the bales up, roadsides it next to the field or at a central stack pad, a stack location, stacks the hay and makes the stacks.").

[28] *Id.* at 64:16–66:14.

[29] *Id.* at 145:15–18.

[30] DX47, at 80:25–81:3.

[31] McGuire repeatedly attempts to put into issue the character and actions of Anspach and others.  *See* Pl.'s Post Trial Opening Br. 3 ("[Anspach's] actions are at issue. . . . Anspach did not like [McGuire]"); Trial Tr. 23:17-21 ("So the unfortunate reality is that the substantial loss sustained by Mr. McGuire for which he seeks compensation here came about as a result of an action of a condemning authority incited by a bad judgment by an angry supervisor of the BIA.").  When suit is brought under the Tucker Act, however, a plaintiff must make the "concession that the government action was valid." ***Hearts Bluff Game Ranch v. United States***, No. 2010-5164, 2012 WL 148692, at *6 (Fed. Cir. Jan. 19, 2012); *see also* ***Tabb Lakes, Ltd. v. United States***, 10 F.3d 796, 802 (Fed. Cir. 1993) ("[The] claimant must concede the validity of the government action which is the basis of the taking claim to bring suit under the Tucker Act.").  The validity of the BIA's actions and the motivations for it are thus beyond the scope of this Court and not in issue.

had visited and studied the bridge and concluded that it should be closed.[32] Trimels believed that the bridge was "beyond repair" due to major structural damage.[33]  He also did not notice any signs of "regular maintenance."[34]  In a March 25, 1999 report, Trimels outlined the problems with the bridge and formally recommended its closure.[35]

After Anspach informed McGuire that the BIA would remove the bridge, two members of CRIT wrote Anspach concerning the removal.  In a December 9, 1998 letter, Chairman Daniel Eddy, Jr., of CRIT wrote that "removal of this bridge would place a hardship on Mr. McGuire as it would severely limit access for hay hauling trucks."[36]  Chairman Eddy also wrote, "We are requesting the removal of the bridge be delayed until we are able to work out a satisfactory solution to the problem."[37]  In a December 23, 1998 letter, Vice Chairman Russel Welsh of CRIT wrote that CRIT was "much concerned about the closure of the bridges that cross irrigation canals."[38]  Anspach wrote CRIT back on December 24, 1998 and said that the "bridge was not built or authorized by the Bureau" and that it was "unsafe and a potential hazard to anyone that uses it, especially heavy vehicles."[39]  The BIA planned to remove the bridge during the dry up period in January 2000.[40]  Anspach wrote that McGuire could "reroute existing ground access methods or . . . develop a new bridge plan that meets project standards as determined by the Bureau."[41]

The BIA then sent McGuire a series of letters in 1999 informing him of the unchanged plan to remove the bridge in January 2000.  A February 5, 1999 letter from Anspach told McGuire that it was the BIA's "intent to remove the unsafe and unauthorized wooden bridge across canal 19R which runs to your leased lands" and that the removal would occur during January 2000.[42]  Anspach also told McGuire that he could submit "plans, with specifications, for a new bridge and apply for a crossing permit" and to contact Ted Henry with questions.[43]  An August 25, 1999 letter informed McGuire that "[i]t remains [BIA's] intent to remove" the "unsafe and unauthorized wooden bridge" and again informed him that he would need to "submit the required documentation" to

---

[32] Trial Tr. 838:14–16.
[33] *Id.* at 836:12–15.
[34] *Id.* at 836:22–24.
[35] DX6, at 26–27.
[36] DX2, at 22.
[37] *Id.*
[38] DX3, at 23.
[39] DX4, at 24.
[40] *Id.*
[41] *Id.*
[42] DX5, at 25.
[43] *Id.*

obtain a permit for a new bridge.[44]  This letter recommended that he speak with Jeffrey Hinkins, the BIA's Supervisory General Engineer in the area.

McGuire discussed a replacement bridge with both Hinkins and Henry, and he recalls proposing that a culvert crossing be used for a new bridge.[45]  He also recalls sketching out a plan for a new bridge in a meeting with Hinkins,[46] although no copy of these plans has been filed with the Court.[47]  Henry testified that he did not receive a formal "written plan[]" from McGuire, but he did think there could have been "handwrit[ten] drawings on a piece of paper that we did together in my office."[48]  Henry, however, did not find these plans "sufficient to go forth and issue a permit on."[49]

McGuire challenged the bridge removal in tribal court in October 1999.  As before this Court, McGuire alleged that removal of the bridge would violate the lease he had with CRIT.[50]  McGuire also complained that the February 5, 1999 letter from Anspach, which notified McGuire of the removal and told him that he would need to obtain approval for a replacement bridge, "would require that a new bridge be installed at Plaintiff's expense."[51]  The BIA did not appear in tribal court, and the parties have not submitted the record of any judgment issued by that court.

On November 12, 1999, Anspach wrote McGuire that the bridge would be "immediately close[d] . . . since it is unsafe for use by the motoring public."[52]  He also reiterated the BIA's "intent to remove the unsafe and unauthorized wooden bridge across canal 19R" in January 2000, and again "encourage[d] [McGuire] to apply for a permit."[53]  The bridge was blockaded in November 1999, and then removed in January 2000.

Following the November 1999 blockade of the bridge, McGuire continued to harvest his planted crops, but that task became more arduous.  Instead of using the convenient Eighth Avenue Bridge, he "was hauling [hay] out on gooseneck trailers around the canal, through the FFA yard, around through the other side and across Brown Road Bridge."[54]  McGuire did not find this to be a practical way to operate the farm,[55] and his focus shifted from "prepar[ing] for another year"[56] to

---

[44] DX7, at 36.
[45] Trial Tr. 76:8–12.
[46] *Id.* at 190:3–5.
[47] *Id.* at 191:24.
[48] *Id.* at 437:1–6.
[49] *Id.*
[50] DX8, at 40.
[51] *Id.* at 41.
[52] DX9, at 49.
[53] *Id.*
[54] Trial Tr. 123:10–14.
[55] *Id.* at 123:19.
[56] *Id.* at 123:5–6.

"salvage."[57]   At the time the bridge was blocked, McGuire testified that he "had about 240 acres of a brand new alfalfa stand on the northwestern portion of the property," and, eventually, he was "able to get those 240 acres of alfalfa out of the northern portion of the property."[58]   To remove the alfalfa, however, he used small gooseneck trailers, instead of the larger haulers he had previously used.[59]

Although he continued to remove and sell previously planted alfalfa in 2000, McGuire did not make his January 2000 lease payment or any subsequent payments.[60]   CRIT demanded payment from him in a July 10, 2000 letter.[61] Since he did not make any payments, the lease was terminated in an August 11, 2000 letter.[62]   McGuire remained on the farm until July 2000.[63]

After McGuire left the property, a new tenant, William Alcaida, leased it.[64]   Although Alcaida's lease began in January 2001, he farmed without a bridge at Eighth Avenue until January of 2002, when he built a new bridge with a concrete culvert crossing.[65]   Alcaida applied for and received a permit to construct this bridge.[66]   In order to receive the permit, he submitted paperwork to the BIA detailing the design and materials for the bridge.[67]   The BIA provided Alcaida with a permit application form, which they created as he was applying for the permit.[68]

### D.   Procedural History

McGuire filed for Chapter 11 bankruptcy relief in federal district court in Arizona on June 5, 2001.  As part of that bankruptcy case, he brought an inverse condemnation claim on November 13, 2001 against the government.   After the government moved to dismiss for lack of subject matter jurisdiction, the bankruptcy court issued a recommendation on December 9, 2002 that it did have jurisdiction, and the district court adopted this recommendation on July 11, 2003. A trial was held in bankruptcy court on April 14 and 15, 2005, and the court recommended that McGuire be awarded $1,132,059.60 in compensation for the regulatory taking of his property.   The district court, however, refused to adopt these recommendations, and held that McGuire's claim had never ripened.   On appeal, the Court of Appeals for the Ninth Circuit disagreed, ruling that McGuire "sufficiently complied with the permitting scheme as practiced by the BIA" and

---

[57] *Id.* at 123:4.
[58] *Id.* at 197:7–14.
[59] *Id.* at 123:3–14.
[60] *Id.* at 204:5.
[61] DX10, at 50.
[62] DX12, at 53; *see also* Trial Tr. 204:16.
[63] Trial Tr. 204:8.
[64] DX43.
[65] Trial Tr. 442:6.
[66] DX 46.
[67] Trial Tr. 442:24–443:9.
[68] *Id.* at 443:10–18.

that his claim had thus ripened.  *McGuire v. United States*, 550 F.3d 903, 909 (9th Cir. 2008); *see also* *McGuire v. United States*, 97 Fed. Cl. 425, 433–37 (discussing the ripeness of McGuire's claim and the Ninth Circuit's analysis of the issue).

The Ninth Circuit, however, also held that the district court lacked jurisdiction over the matter, and transferred the case here.[69]  In this Court, the government filed a Motion To Dismiss, Or In The Alternative, Motion For Summary Judgment on September 3, 2010.  The Court granted-in-part and denied-in-part this motion on February 18, 2011.  The Court held that "[i]ssues of material fact exist as to whether a legally cognizable property interest exists for purposes of the Fifth Amendment" and as to whether the government committed a regulatory taking of McGuire's property.  *McGuire*, 97 Fed. Cl. at 443.  The Court also, however, held that no categorical taking had occurred.  *Id.*  Trial was held in Phoenix, Arizona on September 13–15, 2011.

II.   **Analysis**

As plaintiff, McGuire has the burden of proving the elements of his case by a preponderance of the evidence.  The government challenges that his regulatory taking claim is not ripe, that he has not established a legally cognizable property interest, and that he has not established a taking under *Penn Central Transportation Co. v. City of New York*.  438 U.S. 104 (1978).  The Court will discuss each issue in turn.

A.  The Court Already Decided to Follow the Ninth Circuit's Decision on Ripeness.

In its motion to dismiss, the government argued that McGuire's claim had not ripened, but the Court denied the motion, holding that it would follow the law of the case as established by the Ninth Circuit Court of Appeals.  *McGuire*, 97 Fed. Cl. at 437.  After trial, defendant again contends that McGuire's claim is not ripe.

Generally, "a claim for a regulatory taking 'is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue.'"  *Morris v. United States*, 392 F.3d 1372, 1376 (Fed. Cir. 2004) (quoting *Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 186

---

[69] The Ninth Circuit found that the government had not waived its sovereign immunity in district court for takings claims like McGuire's.  *McGuire*, 550 F.3d at 910–14.  In so holding, the Ninth Circuit explicitly disagreed with a Federal Circuit decision to the contrary.  *Id.* (disagreeing with *Quality Tooling, Inc. v. United States*, 47 F.3d 1569 (Fed. Cir. 1995)).  The Ninth Circuit thus sent McGuire's case to this Court based on a disagreement with an appellate decision this Court is bound to follow.  *See McGuire*, 97 Fed. Cl. at 428–29 (discussing *Quality Tooling*'s application to this case).

(1985)).   The government argues that McGuire "never submitted a permit application"[70] and "did not meaningfully pursue a decision"[71] and that a final decision was thus never reached.

The Ninth Circuit found that McGuire's claim was ripe.  According to that court, "McGuire took 'reasonable and necessary steps to allow' the BIA to exercise its 'full discretion in considering development plans for the property.'" *McGuire*, 550 F.3d at 910 (quoting *Palazzolo v. Rhode Island*, 533 U.S. 606, 620–21 (2001)).  The court found that "McGuire did everything reasonably within his power to prevent removal of the bridge and, when those efforts proved ineffective, to build a new one."  *Id.* at 909.

After an extensive discussion of the applicability of the law of the case in the rather uncommon situation of a transfer from an appellate court in a different circuit, the Court followed the Ninth Circuit's decision as the law of the case in its February 18, 2011 opinion.  *See McGuire*, 97 Fed. Cl. at 433–37.  The Court acknowledged then and acknowledges now that "if [it] were called on to look at this issue anew, it might reach a different decision," since reasonable minds could disagree as to the ripeness of McGuire's claim.  *Id.* at 437.  On the one hand, the government asserts that he "never submitted a permit application" but, as established at trial, McGuire was never given a permit form[72] because none, in fact, existed until after his lease was cancelled.[73]   On the other hand, McGuire was informed in a letter on November 12, 1999 that he needed to "apply for a permit"[74] if he wished to replace the bridge, but he never submitted any documentation to the BIA after receiving this letter, although he had previously discussed a replacement bridge with Henry and Hinkins.[75]

The Court, however, is not writing on a blank slate.  As the Court noted in its prior opinion, "[A] decision in this case has already been made.  A consequence of the law of the case in transferred cases is that judges must, at times, follow decisions that they themselves would not have made."  *McGuire*, 97 Fed. Cl. at 436.  The Court stands by its conclusion, and considers McGuire's claim to be ripe.

> B.  Under the Federal Circuit's Two-Part Test for Takings, McGuire has not Established a Legally Cognizable Property Interest.

The Federal Circuit uses a two-part test to analyze takings.  *See Acceptance Ins. Co., Inc. v. United States*, 583 F.3d 849, 854 (Fed. Cir. 2009); *Am. Pelagic Fishing Co. v. United States*, 379 F.3d 1363, 1372 (Fed. Cir. 2004).  In the recent *Hearts Bluff Game Ranch v. United States* decision, the Federal

---

[70] United States' Opening Post-Trial Br. 28, ECF No. 109.

[71] *Id.* at 29.

[72] Trial Tr. 127:21–22.

[73] *Id.* at 443:10–18.

[74] DX9, at 49.

[75] Trial Tr. 439:14.

Circuit emphasized that the first step is not optional. *See Hearts Bluff Game Ranch v. United States*, No. 2010-5164, 2012 WL 148692, at *3 (Fed. Cir. Jan. 19, 2012).

Under the first step, a court "determines whether the claimant has identified a cognizable Fifth Amendment property interest that is asserted to be the subject of the taking." *Acceptance Ins.*, 583 F.3d at 854. This step is a "threshold" matter and "[i]f the claimant fails to demonstrate the existence of a legally cognizable property interest, the court's task is at an end." *Am. Pelagic*, 379 F.3d at 1372; *see also id.* at 1383 (noting that without a property right cognizable under the Fifth Amendment, a "claim is fatally defective").

If and only if that first step is satisfied, a court asks whether or not the property interest was actually "taken." *Hearts Bluff*, 2012 WL 148692, at *2; *see also Am. Pelagic*, 379 F.3d at 1372 (noting that a court "must determine whether the governmental action at issue amounted to a compensable taking of that property interest"). In this case, the alleged taking is a regulatory one under the standards of *Penn Central Transportation Co. v. City of New York*. 438 U.S. 104 (1978). It is inappropriate for a court to consider the *Penn Central* factors before the first part of the test has been satisfied. *See Hearts Bluff*, 2012 WL 148692, at *3 ("And it is well settled that we do not reach the second step, evaluation of the *Penn Central* factors, without first identifying a cognizable property interest.").

> 1. *A Claimant Must Have a Property Interest that is Legally Cognizable Under the Fifth Amendment.*

To begin the first step, a court "must identify what, if anything, was the subject of the alleged taking." *Acceptance Ins.*, 583 F.3d at 855. The claimant must point to "a specific interest in property that has been taken." *Kitt v. United States*, 277 F.3d 1330, 1336 (Fed. Cir. 2002). The Fifth Amendment uses the word "property" in its technical sense to refer to the "bundle of sticks" concept of property. *Am. Pelagic Fishing*, 379 F.3d at 1376; *see also United States v. Gen. Motors Corp.*, 323 U.S. 373, 377–78 (1945) (noting that "property" is not used in the "vulgar and untechnical sense" to refer to some "physical thing"). It "denote[s] the group of rights inhering in the citizen's relation to the physical thing, [such] as the right to possess, use and dispose of it." *Gen. Motors Corp.*, 323 U.S. at 378.

After a claimant identifies the property interest affected by the government, "the relevant question is whether [that specific] interest is a stick in the bundle of rights" that the claimant has acquired and that mandates compensation under the Fifth Amendment. *Colvin Cattle Co., Inc. v. United States*, 468 F.3d 803, 806 (Fed. Cir. 2006). To determine whether a claimed interest amounts to a compensable property right, a court "look[s] for 'crucial indicia of a property right,' such as the ability to sell, assign, transfer, or exclude." *Hearts Bluff*, 2012 WL 148692, at *4 (quoting *Conti v. United States*, 291 F.3d 1334, 1342 (Fed. Cir. 2002)); *see also Am. Pelagic*, 379 F.3d at 1376 ("We determine whether an asserted right is one of the rights in the bundle of sticks of

property rights that inheres in a *res* by looking to 'existing rules or understandings' and 'background principles' derived from an independent source such as state, federal, or common law.") (quoting *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1030 (1992)).  The "'right to *exclude* strangers, or for that matter friends, but especially the government'" is one of the most important indicators of a property right.  *Mitchell Arms, Inc. v. United States*, 7 F.3d 212, 215 (Fed. Cir. 1993) (quoting *Hendler v. United States*, 952 F.2d 1364, 1374 (Fed. Cir. 1991)).

If an asserted right "is not a stick in the bundle of rights" that a claimant has acquired, then the claim must fail.  *Colvin Cattle*, 468 F.3d at 808; *see also M&J Coal Co. v. United States*, 47 F.3d 1148, 1154 (Fed. Cir. 1995) ("[A] court should inquire into the nature of the land owner's estate to determine whether the use interest proscribed by the governmental action was part of the owner's title to begin with, *i.e.*, whether the land use interest was a 'stick in the bundle of property rights' acquired by the owner.") (citing *Lucas*, 505 U.S. at 1027).

> 2.  *McGuire Claims that he has Legally Cognizable Property Interests in Access via Pre-Existing Routes to his Leasehold, and in a Right to Repair the Eighth Avenue Bridge.*

McGuire asserts two property interests allegedly taken by the government.  First, he states that "he had a property interest in ingress, egress, and access as it existed at the outset of the Lease."[76]  The only access route relevant to this case is the Eighth Avenue Bridge.  According to McGuire, Paragraph 17 of the lease gave him this right of access via pre-existing routes.  Second, he states that he had a right to repair or replace that bridge.[77]  The question for the Court is whether McGuire has these interests and whether they have the "crucial indicia" of a property right.  *Conti*, 291 F.3d at 1342.  If he has failed to satisfy his burden on this issue, his claim is "fatally defective" and cannot proceed.  *Am. Pelagic*, 379 F.3d at 1383.

Before analyzing the claimed interest in pre-existing access routes, the Court will first discuss a collateral matter raised by McGuire.  Finally, the Court will turn to the asserted interest in a right to repair the bridge.

> a.  <u>Expectations and Representations do not Create Legally Cognizable Property Interests.</u>

McGuire expected to continue using the bridge because of the bridge's long history and because of what he recalls a BIA official telling him about ownership of the bridge.  The Federal Circuit has held, however, that mere expectations and representations do not establish a legally cognizable property interest.  *Hearts Bluff*, 2012 WL 148692, at *6.

---

[76] Pl.'s Post Trial Answer to Def.'s Br. 6, ECF No. 112.

[77] *See id.* ("He claims a right to access and to replace the removed Bridge with a safe one.  These are the property rights taken without just compensation.").

The Eighth Avenue Bridge certainly had a long history.[78]  In existence for at least three decades, McGuire recalled his father using the bridge in the 1960's and 1970's.[79]  Perhaps because of this long history, it was in a state of disrepair by 1999.[80]

In keeping with that long history, McGuire expected the bridge to remain, and expected that his convenient access via that bridge would continue.[81] Expectations as to use, however, do not create a property interest for purposes of the Fifth Amendment.  The Federal Circuit has distinguished "between simply not being disturbed in the particular use of one's property and having the *right* to that use of the property."  *Am. Pelagic*, 379 F.3d at 1377.  The court stated that this "right" to a use of the property was required "for there to be a cognizable property interest sufficient to support a takings claim. . . . In other words, use itself does not equate to a cognizable property interest for purposes of a takings analysis." *Id.*  Similarly, "hopes and expectations of future property use are not in and of themselves a cognizable property interest."  *Hearts Bluff*, 2012 WL 148692, at *6.  In this case, McGuire used the bridge to access his property, and enjoyed the easy access that bridge provided, but that history and the expectations that arose from it do not in and of themselves give him a *right* to use it.

McGuire also may have expected to continue using the bridge because of what he recalls a government official saying to him.  A government official's representation about ownership, however, does not create a legally cognizable property interest.  McGuire testified that when he took over the lease, Rodney McVey, acting superintendent of the BIA, told him that the bridge was "his."[82] McVey, however, testified that he did not recall saying this.[83]

Whether or not McVey actually told McGuire that the bridge belonged to him, that representation standing alone does not create a property interest.  The recent Federal Circuit decision in *Hearts Bluff* emphasized that "relying on representations by [government officials] . . . . does not create a compensable property interest."  *Hearts Bluff*, 2012 WL 148692, at *6.  In that case, a government official had represented to the claimant that it would likely be given a permit to make a particular use of its property.  *Id.*  Based on these

---

[78] *See also* Pl.'s Post Trial Opening Br. 26–27, ECF No. 108 ("He leased his property and invested heavily in it to prepare it for farming based on the long standing presence of access across the 8th Ave Bridge—a bridge known to have been the key access to the farm for at least 30 years before the lease commenced.").

[79] Trial Tr. 43:24–44:1.

[80] DX6, at 26–27.

[81] *See also* DX8, at 47 ("Had I known that the bridge would be unilaterally declared 'unsafe' less than halfway through the lease, I would have either not entered into the lease or negotiated different terms.").

[82] Trial Tr. 71:11–14.

[83] *Id.* at 487:19–488:8.

representations, the claimant invested hundreds of thousands of dollars. *Id.* at 11. The Federal Circuit found, however, that expectations of future use, even though they were based on the government's representations, were "collateral" and did not create a legally cognizable property interest. *Id.* at 12.

Thus, whatever McGuire's expectations, or whatever the representations made to him by government officials, McGuire still must establish a legally cognizable property interest grounded in the "traditional hallmarks" of property. ***Conti***, 291 F.3d at 1341.   Representations and hopes as to future use are "collateral." ***Hearts Bluff***, 2012 WL 148692, at *6.

> b. The Lease Does not Guarantee Access via Pre-Existing Routes, such as the Eighth Avenue Bridge.

McGuire asserts that paragraph 17 of the lease gave him a right to access his leased property via pre-existing routes, specifically via the Eighth Avenue Bridge.   Paragraph 17 provides: "LESSEE shall, at all reasonable times, be allowed ingress and egress to the leased premises over existing roadways under the possession and control of LESSOR."[84]   For McGuire to have an access right from this paragraph, the particular roadway must be "under the possession and control of LESSOR."[85]   In this case, CRIT is the lessor, but CRIT lacked both possession and control over the route the government removed.   The lease thus does not convey a right to access the property via the Eighth Avenue Bridge.

The lease and testimony from trial specified that CRIT was the lessor. McGuire testified as such at trial.[86]   The lease also refers to CRIT as the lessor.[87] Anspach did sign the lease on behalf of the BIA, but the signature of a BIA official approving a lease between an Indian tribe and a private party does not make the government a party to the contract. ***See Saguaro Chevrolet, Inc. v. United States***, 77 Fed. Cl. 572, 578 (2007) ("[T]he BIA Superintendent's approval of the Lease does not create privity of contract between plaintiff and the United States."); *see also* ***United States v. Algoma Lumber Co.***, 305 U.S. 415, 421 (1939) (finding that approval by the government of a contract for the sale of tribal property "does not necessarily involve the assumption of contractual obligations by the government").

CRIT lacked control of the bridge.   A December 9, 1998 letter to Anspach from CRIT shows the absence of control, since CRIT asked that "the removal of the bridge be delayed."[88]   If CRIT indeed controlled the bridge, they would not need to request a delay in its removal.   There was also no evidence presented

---

[84] DX1, at 10.

[85] *Id.*

[86] *See* Trial Tr. 93:5–8, 210:14–15.

[87] DX1, at 3.

[88] DX2, at 22.

showing that CRIT did anything to exert control over the bridge, such as maintaining it.

McGuire has not presented any evidence to show that CRIT possessed the bridge, which was located "inside the 19-R Canal, and inside the BIA right of way."[89] McGuire's counsel hypothesized in his opening remarks that if a prior tenant constructed the bridge and if the prior tenant had a lease similar to McGuire's, then the bridge may have become CRIT's property.[90] This hypothetical might be enough to survive a motion to dismiss, but McGuire has not presented any evidence as to the prior tenant or as to CRIT's historical leasing practices. Furthermore, some of the evidence submitted suggests that CRIT did *not* own the bridge. McGuire, for instance, testified that he was told by Rodney McVey, a BIA employee, that the bridge "wasn't the Tribe's."[91] McGuire himself in his opening post-trial brief recognized that "CRIT denied it owned the bridge,"[92] and a BIA official testified that the bridge was not included in the premises conveyed by the lease.[93]

The lease also makes any interest it confers subject to the government's right-of-way. In the second paragraph of the lease, McGuire obtained "the following described premises together with all rights, privileges, necessary easements and appurtenances thereto," but this grant was "subject to any prior, valid, existing claim or rights-of-way, including the present existing roads."[94] Thus, even if the lease included the Eighth Avenue Bridge, any use of that bridge would be subject to the government's right-of-way.

Finally, even if paragraph 17 did cover the Eighth Avenue Bridge, the Court notes that McGuire has never presented any evidence as to why paragraph 17's allowance for "ingress and egress" "at all reasonable times" presents the "crucial indicia" of a property right. *Conti*, 291 F.3d at 1342. As the Federal Circuit has noted, "Not all property interests are legally protected property rights." *Nw. La. Fish & Game Pres. Comm'n v. United States*, 574 F.3d 1386, 1390 (Fed. Cir. 2009). "'[O]nly those economic [interests] are 'rights' which have the law [in] back of them, and only when they are so recognized may courts compel others . . . to compensate for their invasion." *Id.* (quoting *United States v. Willow River Power Co.*, 324 U.S. 499, 502 (1945)). Although McGuire asserts that paragraph 17 includes the bridge, he has not shown why this paragraph's allowance for access "at all reasonable times" amounts to a "legally protected property right[]." *Nw. La. Fish*, 574 F.3d at 1390.

---

[89] Trial Tr. 360:19–20.

[90] *Id.* at 21:15–22 ("It was his predecessor's . . . and under [his predecessor's] lease it would have become the CRIT's bridge if the predecessor's lease was the same presumably. The bridge belonged to the Colorado River Indian Tribes.").

[91] *Id.* at 71:11–14.

[92] Pl.'s Post Trial Opening Br. 16, ECF No. 108.

[93] DX47, at 115:18.

[94] DX1, at 3.

c. <u>The Pertinent Federal Regulations Only Allow
for Bridges Based on Revocable Permits.</u>

Federal regulations cover BIA canals, and make crossings like the Eighth
Avenue Bridge subject to revocable permits. As McGuire remarked at trial, "BIA
is very protective of their canals."[95] These regulations are one legal means to
protect the canals and the irrigation system. As discussed below, the Federal
Circuit has found that no legally cognizable property interest exists in uses of
property dependent upon revocable permits.[96]

The regulations in place at the time McGuire signed his lease specified
that bridges like the Eighth Avenue Bridge could only exist with permission of
the government:

> After a project is completed, additional structures
> crossing or encroaching on project canal, lateral or
> drain rights-of-way which are needed for private
> use may be constructed privately in accordance with
> plans approved by the Officer-in-Charge or by the
> project. In either case the cost of installing such
> structures will not be at the project's expense. Such
> structures will be *constructed and maintained under
> revocable permits* on proper forms issued by the
> Officer-in-Charge of the irrigation project to the
> party or parties desiring such structures.

25 C.F.R. § 171.9(c) (1999) (emphasis added). Regulations that exist at the time
a claimant acquired the property are part of the background principles that a court
must consider in determining whether or not the claimant had a legally cognizable
property interest. *See Am. Pelagic*, 379 F.3d at 1379 ("Because it was already in
place by the time [the plaintiff purchased the property], the Magnuson Act was an
'existing rule' or 'background principle[]' of federal law that inhered in [the
plaintiff's] title.") (quoting *Lucas*, 505 U.S. at 1029–30). *Cf. Members of Peanut
Quota Holders Ass'n v. United States*, 421 F.3d 1323, 1331 (Fed. Cir. 2005)
("[A] compensable interest is indicated by *the absence of express statutory
language precluding the formation of a property right* in combination with the
presence of the right to transfer and the right to exclude.") (emphasis added).

In this case, McGuire essentially argues that he had a compensable right to
use a bridge that could only be "constructed and maintained under [a] revocable
permit[]." 25 C.F.R. § 171.9(c). This argument is foreclosed by Federal Circuit

---

[95] Trial Tr. 116:20–21.

[96] McGuire has not argued that he had a legally cognizable property interest in a
permit, implied or otherwise, to cross the BIA canal at Eighth Avenue. Any such
argument would be foreclosed by precedent. *See, e.g.*, *Am. Pelagic*, 379 F.3d at
1374 ("American Pelagic did not and could not possess a property interest in its
fishery permits.").

case law, since decisions of the Federal Circuit have made clear that no legally cognizable property interest exists in uses of property dependent upon revocable permits.

In *Mitchell Arms v. United States*, for instance, the government revoked a permit that the claimant needed to sell its property in the way it had planned for and preferred. ***Mitchell Arms***, 7 F.3d at 213.  There, the claimant contracted with an overseas company to purchase and import assault rifles; after the government suspended and eventually revoked the claimant's permits to import the rifles, the claimant brought suit and alleged that the government had taken its property. *Id.* at 215.  The Federal Circuit held that "Mitchell's expectation of selling the assault rifles in domestic commerce—the interest affected in this case—was not inherent in its ownership of the rifles" because that interest was "totally *dependent* upon the import permits." *Id.* at 217.  The Court noted that the "ability to import the rifles and sell them in the United States was at all times entirely subject to the exercise of ATF's regulatory power" and therefore "any expectation which arose on Mitchell's part as a result of the import permits did not constitute a property right protected by the Fifth Amendment." *Id.*

In a similar case, *American Pelagic Fishing Co. v. United States*, the claimant invested $40 million in a fishing vessel that was meant to fish in the Exclusive Economic Zone ("EEZ") of the United States in the Atlantic Ocean. ***Am. Pelagic***, 379 F.3d at 1366–68.  The vessel was required to carry certain permits that were issues, but then revoked. *Id.* at 1368–69.  Due to the size and configuration of the vessel, it could not operate profitably without the permits, and the claimant was forced to sell it. *Id.* at 1369.  The Court of Federal Claims had found that "[t]he relevant stick in the bundle in this context is the right to use the *Atlantic Star* to fish, subject to regulation" and that "the right to use is one of the group of rights inhering in the citizen's relation to [a] physical thing" and concluded that the claimant had a property interest. *Id.* at 1370 (quoting ***Am. Pelagic Fishing Co., L.P. v. United States***, 49 Fed. Cl. 36, 46–48 (2001)).

The Federal Circuit in *American Pelagic* reversed the Court of Federal Claims' finding of a legally cognizable property interest. ***Am. Pelagic***, 379 F.3d at 1383.  According to the Federal Circuit, it had to answer this question: "Was the right to fish for Atlantic mackerel and herring in the EEZ a legally cognizable property interest such that it was a stick in the bundle of property rights that American Pelagic acquired as the owner of the *Atlantic Star*?" ***Am. Pelagic***, 379 F.3d at 1376.  The court found that "the ability to fish in the EEZ" was "a matter of governmental permission, rather than a property right." *Id.* at 1380.  Thus, "no right to fish in the EEZ inhered in American Pelagic's title when it acquired the *Atlantic Star*" and "[b]ecause the right to use the vessel to fish in the EEZ was not inherent in its ownership of the *Atlantic Star*, American Pelagic did not suffer the loss of a property interest for purposes of the Takings Clause." *Id.* at 1381.

16

The facts of this case are similar to the situations in both *Mitchell Arms* and *American Pelagic*. In all three cases, the claimants invested large amounts of money into their property, hoping to make certain uses of that property. In *American Pelagic*, the claimant hoped to use its fishing vessel, in which it had invested $40 million, to fish in the EEZ. In *Mitchell Arms*, the claimant contracted to import and sell guns. In this case, McGuire improved his farm and hoped to access one part of his farm via the Eighth Avenue Bridge. In all three cases, however, the anticipated uses were ones dependent upon government permits. The claimant in *American Pelagic* needed permits to fish in the EEZ, and in *Mitchell Arms* the claimant needed permits to import its guns. In this case, McGuire's expected use of his property was also wholly dependent upon the government's permitting scheme, since crossings over BIA canals could only exist based on "revocable permits." *See also* **Lemmons v. United States**, 496 F.2d 864, 866 (Ct. Cl. 1974) ("The lease drew its vitality, and indeed its very existence, from a permit issued by the Corps of Engineers. Plaintiff conceded he could not operate his [business] without the permit.").

The Federal Circuit has similarly held that claimants are not entitled to compensation for any increased value that government permits might bring to their property. In *Colvin Cattle Co. v. United States*, for instance, the claimant owned a ranch adjacent to federal grazing land in which the claimant had stockwatering rights. **Colvin Cattle**, 468 F.3d at 805–06. For decades, the claimant also had a lease to graze on that land, but, when the government canceled the lease, the claimant sued. *Id.* The Federal Circuit found that the claimant had no property right to allow its cattle to graze on the nearby land. *Id.* at 809. That court held that the ranch "may have lost value" when the government cancelled the grazing lease, but the claimant could not recover for this loss because it "has not occurred by virtue of governmental restrictions on a constitutionally cognizable property interest." **Colvin Cattle**, 468 F.3d at 808. Here, while having to use alternate access routes may have interfered with the profitability of McGuire's lease and caused it to lose value, merely losing value, as in *Colvin Cattle*, does not mandate compensation.

> d. McGuire has not Established a Legally Cognizable Property Interest in Access via Pre-Existing Routes.

The Federal Circuit has been clear that a claimant must have a compensable right to the particular use with which the government interfered. Lacking that, a claim is "fatally defective." **Am. Pelagic**, 379 F.3d at 1383.

McGuire has claimed to have a legally cognizable property interest in access as it existed at the outset of the lease. The Federal Circuit looks for the "crucial indicia" of a property right, **Conti**, 291 F.3d at 1342, and considers existing regulations to determine whether a claimant has a legally cognizable property interest. **Am. Pelagic**, 379 F.3d at 1379. As discussed above, the lease did not cover use of the bridge at Eighth Avenue, because it only covered roadways "under the possession and control" of CRIT, which lacked both

possession and control of the bridge.  Even if the lease did cover the bridge, McGuire has not presented any evidence that this would amount to a legally cognizable property interest.  An allowance for use of another's roadways "at all reasonable times" does not necessarily have the "'crucial indicia of a property right,' such as the ability to sell, assign, transfer, or exclude." *Hearts Bluff*, 2012 WL 148692, at *4 (quoting *Conti*, 291 F.3d at 1342).  Furthermore, the regulations only allowed for bridges like the one at Eighth Avenue if they were based on revocable permits, and no legally cognizable property interest exists in uses dependent upon revocable permits.  McGuire has also not presented any evidence that he could exclude, assign, sell, or transfer his interest in access via pre-existing routes.  In fact, McGuire testified that he could *not* exclude dump trucks from the bridge.[97]

McGuire has cited a few cases that deal with the right of access to land, but none of those cases are relevant here.  He cites a few cases dealing with a total deprivation of access. *See, e.g.*, *Foster v. United States*, 607 F.2d 943, 950 (Ct. Cl. 1979) (finding a taking where the defendant was "[d]enying access 100% of the time" to an Air Force base, under which plaintiffs owned mineral rights); *Stephenson v. United States*, 33 Fed. Cl. 63, 71 (1994) (noting that plaintiffs were denied "physical access to the surface (by fencing and locked gates)" over their mineral rights).  A total deprivation did not, however, occur here, since McGuire could still access his property from the north via Levee Road, or from either side by driving along the canal banks.  In fact, he harvested the hay that had been planted prior to the bridge's removal.[98]  He also cites two cases from the state of Florida.  In the first, the Supreme Court of Florida found that "[a]ccess, as a property interest, does not include a right to traffic flow even though commercial property might very well suffer adverse economic effects as a result of reduced traffic." *Dep't of Transp. v. Gefen*, 636 So.2d 1345, 1346 (Fla. 1994).  In the second case, the Supreme Court of Florida found that "the fact that a portion or even all of one's access to an abutting road is destroyed does not constitute a taking unless, when considered in light of the remaining access to the property, it can be said that the property owner's right of access was substantially diminished." *Palm Beach Cnty. v. Tessler*, 538 So.2d 846, 859 (Fla. 1989).  McGuire's convenient access route over the government canal was removed, but he has not established that he had a right to access via that one particular point.

McGuire has not shown that a right to access via pre-existing routes is part of the bundle of rights that he, as lessee, possessed in the farm in Arizona.  As in *Mitchell Arms*, McGuire's "financial expectations" may have been "frustrat[ed]," but mere frustration of expected profit does "not amount to the taking of a property right protected by the Fifth Amendment." *Mitchell Arms*, 7 F.3d at 217.

---

[97] Trial Tr. 83:10–12.
[98] *Id.* at 197:7–14.

3.  A Claimed Right to Repair or Replace the Bridge at
    Eighth Avenue does not Provide a Property Interest for
    Fifth Amendment Purposes.

McGuire has also claimed a property interest exists in the right to repair the bridge, and cites two sources for this right: the lease and the regulations.

At trial, McGuire testified that he was "ready and willing and able" to construct a new bridge,[99] although not all the evidence submitted to the Court supports this assertion.  In the Tribal Court lawsuit, McGuire had complained that the government's removal of the bridge and notice to McGuire of how to obtain approval for a new bridge "would require that a new bridge be installed at Plaintiff's expense."[100]  In an affidavit, he also stated that he considered the lease breached if "the bridge is removed or if a new bridge is built and I am expected to pay for all or a portion of the costs."[101]  Furthermore, despite McGuire's apparent willingness to repair the bridge, Ted Henry testified that McGuire never "asked if he ever could repair the bridge,"[102] and Albert Trimels testified that he "didn't believe it had been maintained at all" and that there were no "signs of [the bridge] receiving regular maintenance."[103]

The applicable regulations do not mention even once a right to repair crossings like the Eighth Avenue Bridge.  Under 25 C.F.R. § 171.9(c), which applies here and is discussed above, structures like that bridge are "maintained under revocable permits," but the regulation does not mention any right to repair. The following paragraph in the regulations, 25 C.F.R. § 171.9(d), does reference repairing damaged crossings, but this regulation only applies to a "crossing constructed *for and by*" the BIA and then transferred to some other entity.  The Eighth Avenue Bridge was not constructed by the BIA,[104] and that paragraph— and its reference to repairs of damaged crossings—is thus irrelevant to this dispute.  McGuire has cited no other source in the regulations for a right to repair.

McGuire also bases his claim in a right to repair on paragraphs 9 and 10 of the lease, which relate to improvements on the land.  In pertinent part, paragraph 9 provides:

---

[99] *Id.* at 145:19.
[100] DX8, at 41.
[101] *Id.* at 47.
[102] Trial Tr. 435:15–16.
[103] *Id.* at 836:22–24.
[104] As noted above, the builder of the bridge is unknown.  McGuire has speculated that it could be a prior tenant, Trial Tr. 21:15–22, and one letter from CRIT suggested that the original developer of the land had built it. DX2, at 22.  In any event, no party has ever suggested or presented evidence that the BIA built the bridge, and 25 C.F.R. § 171.9(d) thus does not apply.

> All buildings and improvements . . . shall at the option of LESSOR, remain on said premises after the termination of this Lease and shall thereupon become property of LESSOR.  LESSOR shall have the right to require LESSEE to remove any damaged or unsightly buildings and/or improvements on the leased premises or otherwise restore the leased premises upon, or within thirty (30) days after, termination of this Lease, by giving written notification to LESSEE within at least ninety (90) days prior to Lease termination.  If so notified, LESSEE, at LESSEE'S sole cost and expense, shall remove said buildings and/or improvements and shall restore the premises to the condition existing at the time this Lease commenced.[105]

Paragraph 10 requires that "improvements placed on the leased premises . . . be constructed in a good and workmanlike manner" and also requires that the lessee "maintain the premises and all improvements thereon . . . in good order and repair."[106]

Although a bridge would generally be considered an "improvement," these paragraphs do not cover the Eighth Avenue Bridge.  Black's Law Dictionary defines an "improvement" as an "addition to real property, whether permanent or not; esp., one that increases its value or utility."  BLACK'S LAW DICTIONARY 826 (9th ed. 2009).  These paragraphs reiterate the normal rule that "improvements to realty are considered part of the real property[, and] ownership of the improvements follows title to the land."  *Banner v. United States*, 238 F.3d 1348, 1356 (Fed. Cir. 2001).  Thus, the paragraphs provide that if a lessee constructs an improvement on the leased premises, the title to that improvement will pass to CRIT.  As discussed above, however, the bridge is located "inside the 19-R Canal, and inside the BIA right of way."[107]  In testimony at the trial in bankruptcy court, Allen Anspach also stated that the bridge was "not part of Mr. McGuire's leased premises" because it was "part of the BIA right-of-way."[108]  These paragraphs only cover improvements on "said premises," and the premises do not include the 19-R Canal.  Furthermore, even if the paragraphs included the bridge within their grasp and conveyed to McGuire a "right to repair" the bridge, it is unclear why this right would amount to a compensable property interest.

---

[105] DX1, at 8.

[106] DX1, at 8.

[107] Trial Tr. 360:19–20.

[108] DX47, at 115:18–24.

   4. No Property Interest for Purposes of the Fifth
      Amendment Exists.

   The Federal Circuit has recently noted that a court may not conduct a
*Penn Central* analysis until it finds that the government has interfered with a
legally cognizable property interest. *See **Hearts Bluff***, 2012 WL 148692, at *3.
In this case, McGuire has not established that the government took a stick in the
bundle of rights that he had as lessee.

   Merely having some interest in property does not establish a property right
for purposes of the Fifth Amendment. Frequently, in cases before the Court of
Federal Claims and the Federal Circuit, a claimant will own some property, but
still fail to establish a legally cognizable property interest for purposes of the Fifth
Amendment. In *Colvin Cattle*, the claimant owned property on which he raised
livestock, but nevertheless failed to establish a property interest in the right to
have that cattle graze on nearby land. ***Colvin Cattle***, 468 F.3d at 808. There, the
Federal Circuit noted that the fact that the plaintiff's "ranch may have lost
value . . . is of no moment because such loss in value has not occurred by virtue of
governmental restrictions on a constitutionally cognizable property interest." *Id.*
Here, McGuire leased a farm, but he has not established that he had a right to
access that farm via pre-existing methods, such as the Eighth Avenue Bridge, or
that he had a right to repair the bridge.

   The Federal Circuit has noted that "a *compensable interest* is indicated by
the absence of express statutory language precluding the formation of a property
right in combination with the presence of the right to transfer and the right to
exclude." ***Members of Peanut Quota Holders Ass'n***, 421 F.3d at 1331. In this
case, the regulations specifically allowed the government to revoke a permit for
bridges like the one at Eighth Avenue. 25 C.F.R. § 171.9(c). McGuire also could
not "'exclude'" anyone from these claimed interests. ***Mitchell Arms***, 7 F.3d at
215 (quoting ***Hendler***, 952 F.2d 1364). He could also not "transfer" these
interests. ***Members of Peanut Quota Holders Ass'n***, 421 F.3d at 1331. His
claimed interests thus lack the "'crucial indicia of a property right,' such as the
ability to sell, assign, transfer, or exclude." ***Hearts Bluff***, 2012 WL 148692, at *4
(quoting ***Conti***, 291 F.3d at 1342).

   C. Since McGuire Has Not Demonstrated that he had a Compensable
      Interest in what was Allegedly Taken, a *Penn Central* Analysis is
      Unnecessary.

   Demonstration of a compensable interest is an absolute requirement of a
regulatory taking claim. As the Federal Circuit has noted, "[I]f a claimant fails to
demonstrate that the interest allegedly taken constituted a property interest under
the Fifth Amendment, a court *need not even consider* whether the government
regulation was a taking under the analysis set forth in *Penn Central*." ***Conti***, 291
F.3d at 1339. Here, McGuire has extensively discussed *Penn Central*, but spent
scant time on the necessary first step of the analysis. *See also **McGuire***, 97 Fed.
Cl. at 438 (noting McGuire's "failure to, even once, discuss this critical first step

of a takings analysis in any of his submissions to the Court."). Since the Court finds that McGuire has failed to meet his burden of showing a compensable interest, an analysis of the challenged actions under *Penn Central* is unnecessary.

III.    **Conclusion**

For the above-mentioned reasons, the Court finds that the government did not commit a regulatory taking. The Clerk is directed to enter judgment in favor of the government.

No costs.

IT IS SO ORDERED.

_____s/Bohdan A. Futey_____
**BOHDAN A. FUTEY**
**Judge**